Robert N. McFall
42312 N. Stonemark Drive
Anthem, AZ  85086
C: 602-359-3901
H: 623-551-8046

September 2, 2009

Brett L. Messinger, Esquire
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103

Re:    Jennifer and Robert Keszler v. First Horizon Home Loan Corporation,
a division of First Tennessee Bank National Association

Dear Mr. Messinger:

You have asked me to render an opinion regarding the care exercised by First Horizon in
the handling of the proceeds of a construction loan involving Jennifer and Robert Keszler,
and to comment on the expert report prepared by Delta CPM, especially in regard to its
calculation of the damages purportedly suffered by Dr. and Mrs. Keszler.

This is the first time that I have served as an expert witness.  For my time, I am being
compensated at the rate of $65 for each hour of work.

This report is broken into a number of sections.  The first section describes my
qualifications to serve as an expert.  The second section lists the documents I reviewed and
relied upon in the formulation of my opinion.  The third section discusses the background
as understood by me through a review of the documents.  The fourth section sets forth my
opinions related to the conduct of First Horizon and Dr. and Mrs. Keszler.  The fifth section
sets forth my criticism of Delta CPM, especially in regard to its calculation of the damages
purportedly suffered by Dr. and Mrs. Keszler.

## I.    Qualifications

Recently I have been a private contractor with the Federal Insurance Deposit Corporation
("FDIC"), assisting it with the disposition of assets from failed financial institutions.  Prior
to becoming involved with the FDIC I was actively engaged in a 29 year career in bank
management.

My formal education consists of:  Bachelor's Degree in Finance from Indiana University in
1979 and an MBA from Butler University in 1988.  I began my banking career in July 1979

working at Bank One in Indianapolis (formerly known as American Fletcher National Bank) in their management training program. I served in the retail banking centers for seven years. In 1984 my construction lending career was launched. When I was promoted to Branch Manager of an office on the northeast side of Indianapolis in 1984, I inherited an office that was experiencing a rapid growth in residential new construction loans. I generated and serviced up to 40 consumer construction loans at a time, ranging from $250K to $2MM.

In 1986, I moved to First Indiana Bank, a FSB, where I designed and developed new one-time close construction loan products. My responsibilities included co-authoring the construction loan policy & procedure manual, the initial design and ongoing modifications to the product guidelines and parameters, creation of loan documents and construction loan related documents. These documents included the Construction Loan Agreement, draw request form, closing cost worksheet, product disclosures, inspection forms, budget spreadsheets, builder approval questionnaire and supporting forms, draw approval form, and loan modification forms. At its peak, I managed over 300 consumer construction loans, plus an additional 100 builder loans. The One-Time-Close loans in the portfolio ranged from under $200K to over $3MM.

I was also involved in supervising the loan production staff, underwriters, customer service personnel, draw administrators, and loan modification specialists. Supervisory duties included training, performance reviews, review & approval of draws and draw exceptions, customer service, and problem loan workouts.

In 1995 I returned to Bank One, this time as National Construction Lending Division Manager, I redesigned and expanded the One-Time-Close and lot loan products, and added two home renovation products. I revamped the loan documents and draw documents, and updated the division's policy and procedure manual. My duties included the daily supervision of two office staffs (one in Indianapolis and the other in Phoenix). My duties also included product and sales training to the retail and wholesale mortgage personnel, to underwriters, and to my division staff. I reported to the President of Bank One Mortgage and was a member of the senior management team, working closely with the CFO, COO, and the other division managers (Loan Operations, Marketing, Secondary Marketing, Loan Servicing, Compliance, IT, and Sales). During my tenure, the loan portfolio grew from under $40MM to over $400MM, and over 700 consumer construction loans.

In 1998 I moved to Arizona and opened a loan production office for First Indiana Bank in Scottsdale. From 1998 to 2001 I managed the regional construction lending office, supervising two customer service/draw administration specialists. I worked directly with builders, developers, Realtors, and mortgage bankers to promote our One-Time-Close and two-time close loans, lot loans, and builder lines of credit. I managed the loan portfolio and draw process for the regional office.

I moved to Union Federal Savings Bank/Waterfield Financial in 2001, as the bank's regional construction lending manager for Arizona. I continued to supervise the draws and

portfolio for the region.  I managed a builder and consumer construction loan portfolio that consisted of 120 loans and $90MM in size.

In 2002 I moved to the Scottsdale based bank, First National Bank of Arizona (FNBA). From December 2002 to August 2005 I managed all facets of the residential construction loan product and portfolio management for the bank's mortgage division.  The bank had operations in three states (AZ, NV, & NM).  Products included One-Time-Close loans, two-time close construction, and lot loans.  During my tenure I redesigned the entire product, including: new products, product guidelines and parameters, wrote the policy & procedure manual, redesigned the loan documents, and restructured the loan servicing staff.  I oversaw the loan processing, underwriting, and closing of construction loans in the three processing centers, and was supervisor of the loan servicing and draw administration personnel that were located in five regional locations.  I performed all sales, product, underwriting, technical, and draw training.  During my tenure at FNBA, the loan portfolio grew to over 250 loans and $100M in size.

In August 2005 I joined Biltmore Bank of Arizona.  I was hired by Biltmore Bank as a Managing Director:  a member of senior management team, and the manager/leader of the construction & builder division.  My division's focus was on residential new construction lending and commercial real estate construction in central Arizona.  We targeted custom home builders, consumer construction loans, major remodeling loans, and small volume production builders (fewer than 200 houses built per year).  I played a key role in the bank's enhancements, restructuring, and redesign of the construction loan products, loan documents, and draw systems.  My division's  portfolio grew to over $90MM and 125 loans.

For over 25 years I have been in bank management, specializing in the management and administration of residential construction loan products and loan portfolios.  My responsibilities have included One-Time Close and traditional construction and lot loan product development; designing policy & procedure manuals and product guidelines; supervising construction lending division staff in the underwriting, closing, draw administration and customer service of construction loan products; and training construction lending personnel, including sales, processing, underwriting, closing, draw administration, loan workouts, and customer service.  I am familiar with the One-Time-Close (OTC) product and it's administration by lenders throughout the country.

A copy of curriculum vitae is included with this report.


## II.    Documents Reviewed

In formulating my opinions, I have reviewed the following documents:

- Notice of Removal and documents attached, including the Complaint for Breach of Implied Covenant of Good Faith and Fair Dealing, Breach of Fiduciary Duties (Construction Fraud), Breach of Construction Loan Agreement, Negligent Loan Administration, Negligent Infliction of Emotional Distress and Exhibits;

- "One Time Close" Document Order Form;
- Email dated May 22, 2007 from Liza Eugenio to Susan Young, and string that proceeds it;
- Owner/Contractor Agreement between Ultimate Development, Inc. and Robert and Jennifer Keszler with Cost Breakdown and General Specifications;
- First Horizon Construction Lending Draw Procedures;
- Email dated May 22, 2007 from Susan Young to "Chad";
- Builder's Soft Cost Draw Request;
- Builder Wire Information for Draw Purposes;
- Request to reduce retention to 5%;
- Agreement called Indemnity (Construction Liens and Possessions);
- Interest-Only Period Adjustable Rate Note;
- Addendum to Note;
- Residential Construction Loan Allonge to Note;
- Prepayment Penalty Rider to Construction Loan Note California;
- Deed of Trust;
- Inter Vivos Revocable Trust as Borrower – Acknowledgment;
- Planned Unit Development Rider;
- Fixed/Adjustable Rate Rider;
- Inter Vivos Revocable Trust Rider;
- Residential Construction Loan Rider;
- Residential Construction Loan Agreement;
- Rider to Residential Construction Loan Agreement; and Residential Construction Mortgage Loan Contractor's Affidavit;
- Truth In Lending Disclosure Statement;
- Identification Information;
- Borrower's Consent to Advance to Contractor;
- Important Notice regarding homeowner's insurance;
- Contractor/Builder Disclosure;
- Hazard Insurance Certification;
- Important Mortgage Loan Information;
- Variable-Rate Loan Disclosure for the Permanent Loan Terms at Modification;
- Mortgage Affidavit;
- Important Information About Your Loan Documents;
- Assignment of Contracts, Licenses, Permits and Warranties;
- Contractor's Affidavit;
- Assignments of Rights Under the Construction Contract;
- Retainage Agreement;
- Construction Loan Escrow Waiver;
- Adjustable Rate Disclosure;
- Interim Interest Payment Disclosure;
- Occupancy Affidavit and Financial Status;
- Borrower's Certification & Authorization;
- Error and Omissions/Compliance Agreement;

- Escrow Waiver;
- Insurance Certification;
- Insurance Coverage/Requirement;
- PUD/Condominium Fee Acknowledgment;
- Disclosure of Loan Applicants on Assignment, Sale or Transfer of Loan Servicing;
- Addendum to HUD-1 Settlement Statement;
- Affiliate Business Arrangement Disclosure Statement;
- Notice of Possible Transfer of Loan Servicing;
- Impound Account Authorization;
- Consent to Verify Information;
- Important Notice Regarding Property Taxes;
- Housing Financial Discrimination Act Notice;
- Notice Regarding Furnishing of Negative Credit Information;
- Privacy Notice;
- Closing Instructions;
- Website Printouts from State License Board;
- Insurance file;
- Draw Requests files, with inspection reports;
- Stop Work Notice from Meek's Building Center and Mechanic's Lien;
- Various Preliminary Notices;
- Monthly interest invoices;
- Report prepared by Delta CPM, Inc.;
- Deposition transcript of Robert Keszler (including Exhibits A thru Exhibits ZZ);
- Deposition transcript of Vicky Kirwald; and
- Deposition transcript of Holly Greiser

## III.    Background

Draw Process

On May 27, 2007, Dr. and Mrs. Keszler entered into a construction lending contract with
First Horizon by which they borrowed the sum of $1,500,000 to help finance the
construction of a custom home on a lot which they owned in El Dorado Hills, California.  Dr.
and Mrs. Keszler engaged the services of Ultimate Development to serve as the general
contractor.  Ultimate Development agreed to a construction price of $1,654,724, with
numerous allowances budgeted into the price.

Because the construction loan was less than the total construction price, the Keszler's were
required to deposit the balance of their down payment funds with First Horizon.  As the
initial work was completed, the Keszler's funds were disbursed to Ultimate Development.
Accordingly, Dr. and Mrs. Keszler deposited an additional $174,084 into the construction
account.

The type of construction loan entered into by Dr. and Mrs. Keszler is like many other "One Time Close" loan which existed in the market in 2007, and for which I am familiar, and helped administer and formulate. Once the loan is closed, and the land has been purchased any lot loan has been paid off (if needed), the initial disbursement of the construction funds is typically for pre-construction expenses that may include architect fees, building permits, impact fees, engineering, and start up related costs. These disbursements are commonly referred to as "soft costs." As the construction proceeds over time, the contractor and the borrower jointly submit draw requests to the lender. The draw requests identify the work that has been completed to date, the cost of the related work, other line items needing funding, and the dollar amount requested to be disbursed.

In administering the disbursement of funds, the Keszler's funds would be disbursed first, followed by the construction loan funds. Typically, the draw request form that the bank recommends be used contains a space for both the contractor and the borrowers to sign, as was the case with the Keszler loan. As for the site inspection form that is used by the lender, the lender typically use either a pre-set 20 to 50 line item inspection form or an inspection form that mirrors the builder's budget. In the case of the Keszler loan, the builder's line item budget that was incorporated into the construction contract and signed by Dr. and Mrs. Keszler was used.

These documents are then delivered to the lender, via fax, e-mail, mail, or in person. Upon the lender's receipt of a draw request, the lender will review these documents. If construction work has progressed since the previous site inspection, a new inspection would typically be ordered by the lender. The inspector's job is to provide a visual assessment as to what work has been completed, including installed materials and materials on the job site. The site inspector will submit the inspection form, photographs, and any commentary to the lender. The lender will use both the inspection and the draw request documents to determine how much to disburse. The lender typically uses the overall percent of completion to: a) control the disbursements of the builder's management fee and profits, b) to trigger the lender when the overall project is 90% completed, and c) to track the progress of the project. The next step for the lender is to review that the loan is not delinquent or that there are not any missing or expired documentation. The lender also reconciles the loan balance in the draw file with the lender's accounting department at each draw.

Upon the satisfactory review by the lender, a disbursement is made in accordance with the borrower's prescribed disbursement method. In this case, the Keszler's directed the lender to disburse each draw directly to their builder. Although draw requests are primarily for work that is completed, there are exceptions, especially with custom home construction. It is common in the industry for the borrower and builder to request deposits up to 50% of the material costs for custom manufactured items. The most common are windows, cabinets and countertops, and doors. Traditional construction lending guidelines limit the earnest money deposit for these special ordered materials to the lesser of: the material supplier's required deposit, or 50% of the line item budget for the corresponding material.

Retainage

As noted above, one limitation placed on draw requests involves the withholding of the final draw until the project is completed. The final retainage is typically 10% of the contract price. With large custom construction projects, withholding 10% may be excessive, so a lesser amount may be requested by the borrower, i.e. a 5% retainage. Dr. and Mrs. Keszler requested, and First Horizon agreed, to reduce the retainage to 5% of the contract price. This 5% would not be disbursed by First Horizon until the project was completed, at which time, the retainage would be released. Because Dr. and Mrs. Keszler's construction loan was eventually refinanced prior to the completion of construction, the holding and release of the retainage never became an issue.

Site Inspections

The construction loan documents are clear that the site inspections ordered by First Horizon are solely for the use of First Horizon. For instance, the Residential Construction Loan Agreement provides that First Horizon has the right, but not the duty to inspect the progress of the work. It further provides, "any inspection conducted by the Lender shall be for the Lender's sole protection and benefit. Lender's continued funding of advances after any inspection does not imply that Lender has determined that the Improvements are free from ay defect or deficiency, are being constructed in a safe manner or are being constructed in accordance with Plans and Specifications." The Residential Construction Loan Agreement further provides that Dr. and Mrs. Keszler should not rely upon First Horizon's inspections, but should make their own inspections.

Construction Loan Documents

The construction phase of the loan, as was the case with Dr. and Mrs. Keszler, is defined in the loan documents. During the construction phase, Dr. and Mrs. Keszler were required to pay interest only on the amounts disbursed. First Horizon accounted for the progress of the disbursements by the monthly preparation and mailing of a detailed statement identifying the account activity along with the interest payment invoice to Dr. and Mrs. Keszler. The monthly statements identified the amount(s) disbursed as proceeds of the loan, the date of the disbursement(s), and the accrued monthly interest due on the outstanding loan balance. The documents that I reviewed reveal that Dr. Keszler received, reviewed and understood the content of the monthly statements, and then proceeded to remit the interest payment required. Dr. and Mrs. Keszler never contacted First Horizon to report any errors or to question any draw disbursement activity that was clearly stated in their monthly statements. Through March 2008, Dr. and Mrs. Keszler remained pleased with all outward actions and appearances of Ultimate Development.

Dr. and Mrs. Keszler signed a number of documents at the time of the loan closing on May 27, 2007. Consistent with other construction lending institutions, First Horizon required the documents be signed, acknowledging that each party is clear on their contractual relationships and their respective duties, risks, and obligations. The borrowers are provided with a copy of these documents at the closing to take home with them, so that

they can refer to the documents once they get home, and so they can review them to make sure they understand their contractual obligations, and their respective duties, risks and obligations. Moreover, if Dr. and Mrs. Keszler had any questions regarding the documents, they were provided with a First Horizon contact person to answer any of their questions.

One of the documents that was signed at closing by Dr. and Mrs. Keszler is the Draw Procedure form. The Draw Procedure form provides Dr. and Mrs. Keszler with a choice as to how they want the lender to disburse the loan proceeds. One option was to have a joint check issued by First Horizon. Dr. Keszler testified that he understood this option to be the most safe because it would provide him with an additional means to know how much money was being disbursed by First Horizon and to withhold endorsing the check should a dispute arise between himself and Ultimate Development. However, Dr. Keszler and Mrs. Keszler chose the second option, which was to have the loan disbursed via bank wire directly to Ultimate Development's bank account. This option was selected and authorized by signing the Borrower's Consent to Advance to Contractor.

From my experience in construction lending, it is my opinion that First Horizon went an extra step when it included in the Borrower's Consent to Advance to Contractor, making it clear it is riskier to have their loan funds disbursed directly to Ultimate Development. By signing the Borrower's Consent to Advance to Contractor, Dr. and Mrs. Keszler agreed to accept the risk and to make no claim against First Horizon should the choosing of that option cause harm to Dr. and Mrs. Keszler. In addition to the Draw Procedure form, there were other documents which addressed the options of payment method and Dr. and Mrs. Keszler's agreement to hold First Horizon harmless from any adversity caused by choosing the option allowing First Horizon to wire the funds directly to Ultimate Development.

The documents also provided notice to Dr. and Mrs. Keszler on a method by which they could protect themselves from the possibility that subcontractors and suppliers of building material may not be paid by Ultimate Development. In the Residential Construction Loan Rider signed by Dr. and Mrs. Keszler, it provides that subcontractors and suppliers can file a mechanic's lien against the property should Ultimate Development not pay those subcontracts and suppliers with the money it received from First Horizon. It advised Dr. and Mrs. Keszler that this possibility can be reduced by demanding lien waivers be provided by the contractors from all persons performing labor or furnishing material to the construction project. It also notified Dr. and Mrs. Keszler that they could demand from the contractor a complete list of all laborers and material suppliers so that they could inquire directly whether each had been paid. The documents reviewed show that Dr. and Mrs. Keszler took no action to protect themselves from the risks to which they were warned by First Horizon. In addition, the loan documents make clear that Dr. and Mrs. Keszler were completely and totally responsible for selecting the contractor and assuming all risks associated with that selection.

Other loan documents, especially the Rider to the Residential Construction Loan Agreement, make it further clear that:
(1) Dr. and Mrs. Keszler agreed to indemnify and hold First Horizon harmless from any liability resulting from its own negligence;

(2) First Horizon is not a fiduciary of Dr. and Mrs. Keszler;

(3) First Horizon has no responsibility or liability to Dr. and Mrs. Keszler for the selection of Ultimate Development; and

(4) First Horizon is not responsible to Dr. and Mrs. Keszler should it be determined later that a condition of disbursement had not been met.

## Dr. Keszler's Deposition

In reviewing Dr. Keszler's deposition, he repeatedly stated that he had the utmost respect and confidence in Ultimate Development. I found it alarming that he entrusted Ultimate Development to run and supervise the $1.6 million project without any concerns and regard for controlling expenses, cost overruns, payment to vendors, quality of workmanship, accuracy of construction specifications and drawings, and disbursement of funds. Dr. Keszler was unaware of who most of the subcontractors were, or from whom Ultimate Development purchased material. Dr. Keszler testified that he made several direct cash disbursements to Ultimate Development, without making any determination as to what the funds were for, or whether the funds were being used to pay for the purpose indicated. In regards to Dr. Keszler's direct cash payments to Ultimate Development, I was also surprised that Dr. Keszler never contacted First Horizon to request a draw to reimburse him for the payments he made to Ultimate Development, nor did Dr. Keszler notify First Horizon that he was independently paying Ultimate Development partial draw payments and/or payments for upgrades and change orders. Further, Dr. Keszler did not contact First Horizon to advise the bank that he had made a draw disbursement to the builder, nor did he adjust the builder's draw request amount to reflect the cash payment that he had previously made to the builder.

The documents reveal that the construction project proceeded without incident from the time the first draw request was submitted in August 2007 through April 2008, except for the filing of one mechanic's lien in October 2007. The lien was resolved quickly (7 days), without incident, and to the satisfaction of Dr. and Mrs. Keszler. However, in April 2008, Dr. and Mrs. Keszler made the discovery that Ultimate Development's license had been suspended. Although the issue regarding Ultimate Development's license appears to have been quickly resolved, a further investigation by Dr. and Mrs. Keszler led to the allegations that Ultimate Development was not using the loan proceeds from First Horizon to pay for the materials and labor on their project, or pay the draws and cash payments that were to go for earnest money deposits for materials intended to be delivered to the property. This led to Dr. and Mrs. Keszler accusations against Ultimate Development and its claim that money had been absconded.

## Forgery and Embezzlement

The center of Dr. and Mrs. Keszler's investigation involves their allegation that many of the Draw Request and Advance Deposit Requests submitted by Ultimate Development to First Horizon contained a forged signature by Ultimate Development. There were 10 total Draw Requests submitted to First Horizon, dated August 12, 2007; September 3, 2007; October 2, 2007; November 13, 2007; December 10, 2007; January 2, 2008; January 21, 2007;

February 11, 2008; February 21, 2008; and March 13, 2008. Dr. and Mrs. Keszler state that only the Draw Requests dated August 12, 2007, December 10, 2007 and March 13, 2008 are signed by them. Dr. and Mrs. Keszler stated that the August 12, 2007 Draw Request signature was used on a number of occasions with the dates and the amounts requested being the only changes, or the signature was cut and pasted on a subsequent draw form.

There are also nine (9) Requests for "Advance Deposit" forms. However, Dr. and Mrs. Keszler state that all but the first one to Blomberg Windows was actually signed by them and that the rest are forgeries. However, each of the draw disbursements by First Horizon is itemized in the monthly bank statements received, and interest payments made, by Dr. and Mrs. Keszler. Dr. Keszler also stated that if Ultimate Development had submitted the Draw Request forms to him to sign he would have done so, as there were no problems with the progress of the project. Similarly, Dr. Keszler stated that if requested he would have signed the Advance Deposit forms for: "cabinetry" from Golden State Interiors; the "doors" from California Architectural Traditions, Inc.; "countertop materials" from Stoneco, Inc.; and "custom floor tiles" from Stoneco, Inc. Dr. Keszler testified that at the time he received the April 1, 2008 loan & interest billing statement he noticed that First Horizon had disbursed approximately two-thirds of the money to date, which made sense as the project at that time was approximately two-thirds completed. Dr. Keszler also stated that he was not paying attention to the project and the amount of money being disbursed by First Horizon.

Construction lending departments conduct new hire training, as well as ongoing training for their staffs. One training area that lenders include is to be aware of possible early warning signs that indicate the bank's construction loan and project may have a problem, as discussed later. Construction loans (and other loan types with unfunded commitments ) do not include training in forensic analysis, signature and handwriting analysis, or forgery detection. Unlike teller training, new account training, and new loan application procedures, the servicing of existing loan does not focus on the areas of forensics and forgery in administering loan disbursements, loan servicing, customer service, and credit administration duties.


## IV.    Opinions

In my review and analysis of the lawsuit, loan documents, exhibits, and depositions, First Horizon did not make any errors in performing their duties in processing draws or in exercising care in the management, disbursements, and servicing of the Keszler construction loan. First Horizon exercised proper draw methods and sound lending practices in this matter.   Moreover, it is my opinion that it was not a deviation from the standard of care in First Horizon's failing to discover that draw requests submitted to First Horizon may have been forged.

<u>First Horizon's Draw Administration</u>

Dr. & Mrs. Keszler entered into a $1,654,725 construction contract with Ultimate Development and a $1,500,000 loan contract with First Horizon. The First Horizon loan documents were signed by Dr. and Mrs. Keszler, acknowledging and agreeing to the terms and conditions stated within the construction loan documents. It is my opinion that the documents used by First Horizon represent standards typically used in the construction lending industry and clearly states that the lender does not represent or provide any protection to the borrower. Thus, the documents reveal the acceptance by Dr. and Mrs. Keszler of these risks associated with their selection of their contractor.

I have read the depositions of Vicky Kirwald and Holly Greiser, and reviewed each set of draw documents. I was unable to identify any errors or mis-management by either party that resulted in draw funds being disbursed in excess of construction lending draw standards. The documentation, process, and decisions to modify and fund each draw were within the scope of construction lending standards. In addition, on several occasions Ms. Kirwald reduced the draw request amount from Ultimate Development, disbursing less funds than what was requested. These adjustments resulted in less construction loan funds being disbursed to Ultimate Development. While these actions by Ms. Kirwald and First Horizon were for the lender's sole protection, the Keszler's ultimately benefited because less funds were disbursed, thus reducing the amount of funds that were allegedly embezzled by Ultimate Development. Again, Ms. Kirwald performed her draw administration duties within the appropriate standards expected of someone in her position.

First Horizon acted correctly in processing earnest money deposit requests from the builder. In reviewing the draw documents, First Horizon only approved those special ordered material deposits that adhered to the following prerequisites: a) invoice must be submitted to the lender, b) deposits are typically restricted to special ordered, customized materials only, and b) no more than 50% of the corresponding budgeted line item is to be disbursed.

First Horizon correctly managed the Keszler's construction loan throughout the entire duration of the loan. Several specific instances were noted to this effect. One, when a mechanic's lien and stop notice from Meek's Lumber & Hardware was received by First Horizon, no disbursements were made until the lien was released on November 7, 2007. Second, when First Horizon received an e-mail (Exhibit WW) and phone call from Mrs. Keszler on April 7, 2008, notifying the lender that Ultimate Development's license had been suspended, First Horizon followed Mrs. Keszler's request to "please distribute no money to him until further notice from us.." Third, draw disbursement calculations were closely adhered to, reducing the draw request amounts from the Keszlers and Ultimate Development on numerous occasions.

Robert Keszler's Deposition

I have read the Deposition of Robert Keszler, dated May 19, 2009 and made several observations:, and developed professional opinions regarding fault attributed to Dr. and Mrs. Keszler and why the claims against First Horizon are unsubstantiated.

1) On page 20, Dr. Keszler states, "there was no precast concrete on my house." However, this statement is contradictory to information contained in the Cost Breakdown and the General Specifications that were incorporated in the Owner/Contractor Agreement and signed by Dr. and Mrs. Keszler. Item # 57 of the Cost Breakdown states, "Architectural Precast Concrete (Interior/Exterior)" and indicated an allowance amount of $22,400.00. In the General Specifications the description of this line item states, "Line Item 57: Exterior Trim/Architectural Concrete  Allowance item - All pre-cast concrete trim at exterior of building where indicated on plans, any pre-cast concrete columns (per plan), and precast concrete fireplace surrounds for (4) fireplaces." Dr. Keszler also testified that he had not selected and ordered the Ornamental Iron. In the Owner/Contractor Agreement, Item #60 of the Cost Breakdown states, "Ornamental Iron" and indicates an amount of $14,600.00. In the General Specifications the description of this line item states, "Line Item 60: Ornamental Iron  Fixed Cost Item - Custom fabricated iron guard and hand railings, decorative exterior and interior detail ironwork, per plan, custom made."

When First Horizon made the earnest money draw disbursement in Draw #11, the lender was acting upon the information that Dr. and Mrs. Keszler had signed and delivered to First Horizon at the start of construction, when they delivered to the lender a copy of the contract and the Cost Breakdown. At no time did Dr. or Mrs. Keszler notify First Horizon that either of these line items had been eliminated or modified. As per the Construction Loan Agreement, the lender must be notified before any changes are made to the collateral. The elimination of $22,400 of materials from the project required such notification. Without a notice of a change in the materials being used in their new house, First Horizon acted accordingly, relying on the draw request and information that had been provided to the lender by Dr. and Mrs. Keszler and Ultimate Development.

2) On page 25, Dr. Keszler states, "I believe he photocopied my signature and placed it on the document." On page 27, Dr. Keszler states, " . . . in reviewing the documents, we found that money was essentially stolen from us." As I reviewed the depositions, loan documents, and exhibits, there is not indication that Dr. and Mrs. Keszler ever notified First Horizon that they suspected Ultimate Development of fraud, embezzlement, or forgery. Dr. and Mrs. Keszler had the obligation and duty to review their monthly loan statement and question any transactions or possible errors contained in the monthly statement.

3) On pages 76 & 77, Dr. Keszler acknowledges the receipt and review of monthly loan statements, and states, " . . . I remember seeing that money had been released by First Horizon." And he states on page 82, " Um, my general idea was that draw requests would be presented by the builders, signed by my wife, and the money would be distributed after an inspection by First Horizon." On pages 93 & 104, he states, "I was seeing money being distributed by First Horizon that I hadn't -- I had not specifically signed because I only

signed several draw requests throughout the course of construction. And in asking Mr. Javaheri (principal of Ultimate Development), he said those were progress payments, um, on things that I had already signed." And in regards to the passage of time since Dr. Keszler had signed draw requests, on pages 126 & 127, Dr. Keszler states, "You know, I seen money is being outlaid, 'What's the story with that? I haven't signed that.' He said, 'Oh, those are just progress payments on stuff you have signed."

However, at no time during the term of the construction loan did Dr. or Mrs. Keszler make any contact with First Horizon to report an error, nor to question or inquire about the draws that First Horizon had disbursed to Ultimate Development, or to notify First Horizon of possible errors on the monthly statements. Dr. Keszler asked the builder on multiple occasions about the draw disbursements, but never contact First Horizon in this regard. A total of seven (7) draws were allegedly disbursed without Dr. or Mrs. Keszler's authorization and knowledge over a span of five (5) months. Dr. Keszler's testimony confirms that he was fully aware that draw funds were being disbursed from their loan, but never contacted First Horizon to inquire about the disbursements. Had First Horizon been notified of the alleged forgery(s) by Ultimate Development, standard construction lending practices would have been to tighten and modify the draw disbursement procedures and increase the communications between First Horizon and the Keszlers immediately. Their decision to not contact First Horizon resulted in the continued forgery of draw documents by Ultimate Development. It is a deviation from the expectations of First Horizon and the duties of the Keszlers.

Traditional construction lending standards require the satisfactory review of the draw request documentation, but do not include a forensic analysis of the draw documents for possible forgeries and fraud. Rather, it is the whole system that lenders have developed that allows for clues of improprieties to develop. Usually, a contractor seeking to embezzle funds does not at the same time, continue to pay subcontractors and suppliers. If money is truly being stolen, the lender and owner will know soon enough when either mechanic's liens are filed, and/or other forms of notification of non-payment are received, by those not being paid. In the case of the Keszler project, no such notification was received, except for the one lien (which was resolved in seven calendar days). In my opinion First Horizon's review of the draw request documents met the industry standards.

In reading the depositions of Ms. Kirwald and Ms. Greiser I found that the on-the-job style of training was used for the majority of the draw specialist job. This is consistent with standard training methods in the construction lending industry. While there is periodic training in a classroom setting and/or with training manuals, the individual draw specialist duties are best learned by working under a senior draw specialist. The typical progression is for the new hire to sit, observe, take notes, and ask questions while the trainer performs the daily functions of the draw specialist. Over time, the new hire will assume some of the functions, under close supervision of the trainer. Over time, the new hire will develop the experience, knowledge, and skills to perform the basic functions without constant supervision. From my experience in construction lending, class room training was typically used when there was a change in policy, procedures, and/or processes. E-mails, conference calls, and memos were frequently used to advise draw staff of changes as well.

The general rule of thumb I used was, the more important the issue, the more formal the news should be conveyed. The training used by First Horizon met the loan servicing standards of the construction lending industry.

4) On page 78, Dr. Keszler states, "I remember have a phone -- a phone meeting with First Horizon Bank." This conference call included Ultimate Development, and was conducted by First Horizon to review the specific procedure for draw requests. Included in the exhibits I have reviewed, is a document that appears to be an outline that the lender used in explaining the draw process. While this is not a standard practice by construction lenders, those lenders that do incorporate the pre-construction conference call, do so as a means to clarify the draw process, reinforce the technical aspects of a construction, and answer any questions from the borrower and builder. I commend First Horizon for incorporating the pre-construction conference call into the construction loan process. I also noted in Dr. Keszler's deposition that he stated that Ultimate Development was tardy for the call, and also left the call before it was concluded. Dr. Keszler noted that he was in his office for the call.

5) On page 61, Dr. Keszler states, "You know, I trusted my builder." On page 84, he again states, "I trusted my builder." On page 87, he states, "And we implicitly trusted our builder." On page 88, he states, "We trusted our builder." On page 96, Dr. Keszler states, "The contractor had excellent recommendations, and we believed that he was honest." And on page 97, he states, "To the best of our knowledge, Mr. Javaheri was absolutely honest." On page 103, Dr. Keszler states, "I trusted the people that were working for me to be honest just like I'm honest."

Unfortunately, there are experiences where owners/borrowers incur financial loss due to their builder's poor cash management of the project or the embezzlement of funds, resulting in civil and/or criminal actions against their builder. Based on Dr. Keszler's testimony, it appears that his builder built a strong, trusting rapport with the Keszlers, and then used that trust to embezzle/steal funds from the Keszlers. And as a direct result, Dr. and Mrs. Keszler alleged to have incurred extensive financial loss. However, First Horizon has no liability in the scheme that Ultimate Development used to steal money from Dr. and Mrs. Keszler. At no time during the duration of the construction loan did Dr. or Mrs. Keszler indicate any problems or concerns with their builder or the project, and therefore First Horizon had no cause to be concerned with the project or the construction loan.

6) On page 89, Dr. Keszler stated, "I understood that these estimates were based on Mr. Javaheri's best estimate, and if we went over, I was paying for them out-of-pocket." In the criticism from Delta CPM they allege that funds paid directly by Dr. Keszler to Ultimate Development resulted in financial loss to Dr. and Mrs. Keszler, and First Horizon should be held liable for those cash payment amounts. There is documentation or testimony showing that the Keszler's provided First Horizon with any information regarding these cash payments to Ultimate Development. Also, it is unclear whether these cash payments by the Keszlers were for change orders/allowance overages, or were being paid as part of the original construction price. It is my opinion that if Dr. Keszler had notified First Horizon that he was making cash payments in lieu of construction draw proceeds, First Horizon

*14*

would have adjusted the pending and future draws accordingly. By not receiving any documentation or notification from either the borrower or builder, First Horizon continued to process each draw request as initially agreed upon by all parties.

In addition, from Dr. Keszler's statement above, it appears that Javaheri was in conversation periodically with Dr. Keszler to review the budget, and obtain payments via checks for allowance overages and change orders. It would be sound business for the builder to present, and the owner to review, quantitative information to support the request for a cash payment to cover allowance overages and change orders. While I have not seen such documentation, it is common practice for a builder to present this information and discuss it with the homeowner prior to receiving a payment. For Dr. Keszler to remit cash payments via check to Ultimate Development without supporting documentation as to the status of the project, draw funds received from First Horizon, and an overall review of the budget, is irresponsible and in my opinion is attributed to the Keszler's alleged loss. As for the payments made directly by Dr. Keszler to Ultimate Development, First Horizon cannot be held liable for these payments, as they were not involved in the transaction, and furthermore were never notified of these transactions.

7)  On page 134, Mr. Messinger asks, "If it is true than an advance deposit was required by Golden State Interiors (Exhibit DD), if this form had been presented to you in or around December of 2007, would you have signed it?" Dr. Keszler responds, "Absolutely I would have." And then on page 137, Mr. Messinger asks, "If Mr. Javaheri had presented this request for advance deposit (Exhibit FF) for construction loan funds, would you have signed it in or around January 2nd, 2008?" Dr. Keszler responds, "Yes." On page 139, Mr. Messinger asks, "And if Mr. Javaheri had presented this January 2nd request for advance deposit (Exhibit GG) from construction loan funds to you in or around January 2nd of 2008, would you have signed it?" Dr. Keszler responds, "Probably." And on six subsequent questions related to whether Dr. Keszler would have signed other draw request forms, had each one been specifically presented to him for review and signature Dr. Keszler stated:

on page 141 (Exhibit HH), "Yes;"
on page 144 (Exhibit KK), "Fully, yes;"
on page 145, "If we would have thought it was legitimate, yes;"
on page 149 (Exhibit OO), "Most likely;"
on page 151 (Exhibit PP), "Probably;" and
on page 152 (Exhibit QQ), "If we thought it was legitimate, yes."

Repeatedly and consistently, Dr. Keszler stated that the project was progressing on schedule, there were no signs for alarm or concern, he and the builder were in frequent contact with each other, and the only mechanic's lien known to First Horizon was resolved quickly (7 days). Based on the positive events and the status of the construction project (prior to late March 2008), Dr. Keszler stated repeatedly that had each of these forged draw documents been presented to him for review and approval, he would have signed each of them.

In my opinion, in order for the lender to learn of possible problems with an OTC construction project, the lender must rely on their customer to bring issues and concerns to the lender's attention. Lenders look for the signs that may indicate that there is a possible problem with a project: a) borrower calls the lender to report concerns or problems; b) builder calls the lender to report concerns or problems, c) construction slows or stops for an extended period (over 30 days); d) mechanic's liens and/or stop notices are received by the lender; e) suppliers or subcontractors call the lender about not receiving payment on a lender financed project; f) the site inspection company raises concerns in their inspection report. At no time prior to April 7, 2009 did First Horizon receive any such information, with the sole exception being a mechanic's lien and stop notice, which were resolved in one week. Had the Keszler's contacted First Horizon between October 4, 2007 and March 17, 2008 First Horizon regarding the errors in the draw disbursements, First Horizon would have immediately halted pending and future draws until the problem had been resolved to the satisfaction of both the borrower and lender. However, in my opinion, because no problems were reported to First Horizon, they acted reasonably in processing the draw requests.

In reviewing the case file there were eight draws that the Keszlers allege that they did not authorize. However, from the time of the first alleged forged draw (October 4th) it appears that Ultimate Development was using the draw proceeds to pay the suppliers and subcontractors that were performing working on the Keszler project. Had Ultimate Development not been paying vendors, numerous mechanic's liens would have arose . Through the last draw on March 18, 2008, the lender had only received the one mechanic's lien (Meek's Lumber & Hardware). Delta CPM refers to a second lien in February 2008, but documentation to support the lien was not reported or received by First Horizon.

8) On page 105, a question was asked in regards to Exhibit P, "And this is a request by you and your wife and Ultimate Development to reduce the retention from 10 percent to 5 percent, right?" Answer by Dr Keszler, "Yes."

It is common practice in construction lending to withhold ten percent of the construction contract price until the project is finished. This is done for several reasons, as described below. For more expensive construction projects, it is common for lenders to reduce the retention. This is done because withholding a large sum of money would be excessive in some cases. For example, on a custom home construction project where the contract price is $1,600,000 the lender would traditionally withhold $160,000. Most lenders agree that this large of a dollar amount is excessive, and if requested by the borrower, the lender will reduce the retention to allow the builder the ability to receive an additional $80,000 in draw proceeds to pay vendors that require payment prior to completion. First Horizon acted appropriately in agreeing to the reduced retainage.

Throughout the Delta CPM report and included in Dr. & Mrs. Keszler's claims against First Horizon, there is claims that the lender was responsible for withholding 10% of each draw disbursement until the completion of the project. This interpretation of the "retention" is inaccurate.

I am not familiar with Delta CPM, but it appears that they are incorrectly attempting to apply standard commercial real estate construction principals and funding procedures to a consumer construction loan product. With many commercial real estate construction projects the draw disbursement system is more analytical with detailed draw documentation from every supplier and subcontractor. Lenders obtain AIA draw forms (Architect Institute of America) from each vendor, a copy of the invoice, and a Conditional Lien Waiver. The Lender then disburses loan proceeds directly to the vendor. This method is commonly referred to as a "voucher control." It is rarely used in residential construction lending because of the additional accounting, check writing, tax form, legal, and administrative costs and issues. Delta CPM and the Keszler's have thus incorrectly assumed that First Horizon was obligated to holdback 10% (even though 5% was agreed upon) of each draw disbursement. The construction loan documents clearly explain the draw disbursement procedures and the 10% retention.

9) On page 163, Mr. Messinger asked, "I want to show what you (sic) we've marked as deposition Exhibit VV. This appears to be a string of e-mails between you and Mr. Javaheri." Dr. Keszler, "Uh-huh." Mr. Messinger, "Is this around the time where problems were starting to be realized? Dr. Keszler, "Yes."

There are no correspondences from Dr. or Mrs. Keszler where they raise any questions or concerns to First Horizon. I did notice one correspondence from Dr. Keszler where he asked First Horizon to waive the late fees on his monthly interest payment. The lender agreed to the request. Also, once First Horizon received Mrs. Keszler's e-mail, First Horizon did not disburse any further draws. And lastly, First Horizon responded responsibly and professionally, and exercised sound judgment to each correspondence that was received by the bank.

First Horizon exercised exemplary care, and sound business and lending practices in the administration of Dr. and Mrs. Keszler's construction loan. Through the date of their final draw disbursement by First Horizon:

1. Dr. and Mrs. Keszler were pleased with the progress of their new home,
2. Dr. and Mrs. Keszler were pleased with Ultimate Development's performance,
3. Dr. and Mrs. Keszler did not notify First Horizon of any errors or problems,
4. Dr. and Mrs. Keszler did not inquire, question, or object to the monthly draw disbursements or the interest billings by First Horizon,
5. Ultimate Development appeared to be using the draw funds to pay for the work being done on the Keszler property,
6. Dr. Keszler repeatedly stated in his deposition that he would have approved the draw requests,
7. Dr. and Mrs. Keszler were in regular conversations with Ultimate Development,
8. On several occasions Dr. Keszler paid Ultimate Development for upgrades, overages, and change orders, without any recollection of reviewing budget and draw disbursement payments in order to reconcile the corresponding line item budget,
9. The only mechanic's lien that appeared through the construction loan period was quickly resolved (7 days), and done so to the satisfaction of Dr. Keszler,

10.  First Horizon's site inspections did not reveal any unusual concerns or problems, and

11.  Dr. and Mrs. Keszler lived 1.0 miles from the construction project, providing them with the convenience and proximity to closely monitor the day-to-day activities and progress of their new house.


## V.    Criticism of Delta CPM

### 5% Retainage

As part of my case file review I reviewed the "Analysis of Documents" that was performed by Delta CPM, and is dated July 11, 2009. The Delta CPM reports that the Bank released draw requests without any retention of funds, and that the Bank failed to retain the required 5% from each draw. In response, after reading the loan documents, the 5% retainer is not a per draw holdback, as noted above in the Opinion section, but the 5% is a final retainage, where the final 5% of the contract price is released once the project meets final completion requirements that are clearly stated in the loan documents. Although a 5% to 10% holdback on each draw disbursement is common in commercial real estate construction lending, it is quite rare in residential construction lending. Delta CPM incorrectly applied this commercial real estate practice to residential construction lending. The retainage is clearly explained in the construction loan documents, and was discussed with, and approved by Dr. Keszler and Ultimate Development.

The retainage is required by lenders for several reasons, primarily for the following two purposes: a) to provide the builder with a financial incentive to get the final materials and labor completed in a timely manner; and b) when the final inspection is completed, the appraiser at times will note that specific materials and/or labor has not been completed.

### Lien Waivers

The Delta CPM report refers in Section C to the Lien Releases, incorrectly stating that the lender's failure to obtain conditional lien releases from the builder "unnecessarily exposed the Borrowers to claims by the Contractor, Subcontractors and Suppliers for Mechanics Liens and Stop Notice Claims." However, Delta CPM is incorrect - the builder does not have the legal right to waive or sign lien waivers on behalf of the subcontractors and suppliers, and thus a Conditional Lien Waiver signed by the General Contractor does not protect the borrower/owner against mechanic's liens from the subcontractors and suppliers.

In order for the lender to achieve what Delta CPM states needed to be done, the lender would have had to do the following: a) obtain a list from the builder of all suppliers and subcontractors that would be performing work on the project; b) at each draw obtain a list from the builder of every supplier and subcontractor that performed work since the previous draw; c) to obtain a signed Progress Payment -Conditional Waiver of Lien from each of those suppliers and subcontractors listed in (b) above; and d) prior to the next draw, obtain a Progress Payment - Unconditional Waiver of Lien from the suppliers and

subcontractors listed in (b) above., or a cancelled check showing the payment was received by each of the suppliers and subcontractors. While this magnitude of paperwork is customary in commercial real estate construction lending, it is extremely rare for lenders in residential construction lending to use this draw method. First Horizon did not deviate from the standard of care in regards to the draw administration of the Keszler's construction loan.

Another way for a property owner to insure the funds are being disbursed to the suppliers and subcontractors is to handle all disbursements directly, or by hiring an accountant or agent to perform this function. It is my opinion that it is highly unreasonable to expect or demand the lender to perform these functions. And as noted above, Dr. and Mrs. Keszler were given other draw disbursement options, and Dr. and Mrs. Keszler made the decision to have their lender disburse the draw proceeds directly to their builder.

Delta CPM also alleges that First Horizon should have been alerted to possible problems as a result of the Preliminary 20-Day Pre-Lien Notices that were being mailed on a regular basis to the lender by supplier and subcontractors. Delta CPM asserts that the notices are a warning or demand action be taken by the lender, builder, and owner. However, in fact, a 20-Day Notice is a sound business practice that many suppliers and subcontractors employ for all of the construction projects in which they perform work or provide materials. A 20-Day Notice states that a vendor has been hired to provide materials and/or labor for a set price to the owner's property, and if payment for such materials and services are not paid in accordance to the terms of their agreement with the owner or general contractor, they have the legal right to file a mechanic's lien of the subject property as a measure to collect payment. No where in the 20-Day Notice does it state that a mechanic's lien is forthcoming. Construction lenders retain the 20-Day Notices in a file, but do not typically require the vendor that provided the 20-Day Notice to provide any Lien Release. In my opinion the receipt by First Horizon of the 20-Day Notices was not a cause for concern, but was properly identified by them as a prudent business practice used by numerous vendors.

Delta CPM states in Section III.A.3. that the Borrower received a 20-Day Notice from B-12 Drywall for $37,384 on March 7, 2008. However, the Borrower failed to take any action to insure the supplier was paid. Delta CPM incorrectly states, "These preliminary notices support Item 14 . . . which states subcontractor has not received any form of payment." This is not correct, and is not the purpose of a 20-Day Notice, as it does not state that payment has not been made, or that there is any delinquency in the payment.


"Summary of Inappropriate Payment" Chart

Section F of the Delta CPM report is called:  Summary of Inappropriate Payments From Bank to Contractor.  I studied the six column chart that Delta CPM prepared, reviewed their commentary, and then reviewed it alongside the draw documents that correspond to each of the 17 items listed. Of the 15 line items that Delta CPM states were inappropriately paid, I can not support any of their claims. There are three key issues that are the basis for this

chart: 1) First Horizon disbursed draw funds to Ultimate Development, applying sound judgment, analysis, and processes in performing their duties; 2) Dr. and Mrs. Keszler independently, and without any involvement or guidance from First Horizon, paid to Ultimate Development the amounts in the column "Amount Borrower Paid to Contractor;" and 3) Ultimate Development allegedly committed fraud, forgery, and embezzlement that lead to the alleged financial losses by Dr. and Mrs. Keszler.

In regards to #2 the monies paid by Dr. Keszler directly to Ultimate Development (the total in Part F) is $150,722.46. These cash payments did not involve First Horizon, and furthermore, First Horizon had no knowledge of these direct cash payments. Delta CPM references numerous Work Orders and invoices that Dr. and Mrs. Keszler paid over and above the agreed upon contract price to Ultimate Development. These Work Orders appear to be for upgrades and change orders that Dr. and Mrs. Keszler requested and made throughout the construction period, and furthermore, are not a part of the construction loan budget and draw disbursements used by First Horizon. As summarized below (on Page 23), these work orders and invoices totaled $222,698.31. Based on the nature and purpose of these payments, the amounts in "Amount Borrower Paid to Contractor" should be eliminated from the Keszler claim.

The Delta CPM report also attempts to calculate Dr. and Mrs. Keszler's damages. It states that as of April 28, 2008 "shows $308,243.38 of unsupported payments to the Contractor by First Horizon." It is unclear how the amount of $308,243.38 was derived because the detailed "Summary of Inappropriate Payments From Bank To Contractor" (page 23 of the report) totals only $289,131.86. However, even if First Horizon did anything wrong in the handling of Dr. and Mrs. Keszler's loan, and it is my opinion that they did not do anything wrong, the calculation of damages is not correct. In sum, it is my opinion that Dr. and Mrs. Keszler financial damages were not as a result of First Horizon's administration of the construction draws, and thus First Horizon is not at fault.

Delta CPM seems to calculate the damages in two sections. The first section discusses amounts that were disbursed to Ultimate Development, but not paid to subcontractors and suppliers of material. The second stage discusses the alleged forged Draw Request and Advance for Deposits. The damages alleged are amounts disbursed by a forged request and not paid to the subcontractor and suppliers of material. However, Delta CPM states that payments to Waterworks & Ferguson and to "Exterior Windows/Doors" are not known. It therefore, should not be included in Dr. and Mrs. Keszler's damage calculation. Moreover, the damages calculation also improperly includes money paid by Dr. and Mrs. Keszler directly to Ultimate Development. For example, in regard to Harrison Sloan, although it is alleged that First Horizon improperly released $8,500, that is the amount that Ultimate Development paid to Harrison Sloan. There was an additional out of pocket payment of $2,800 made by Dr. and Mrs. Keszler to Ultimate Development. Dr. and Mrs. Keszler improperly determined that it was their money that was properly paid to Harrison Sloan, as opposed to First Horizon's. Why Dr. Keszler paid an additional $2,800 to Ultimate Development is undocumented. In addition, at no time did Dr. Keszler notify First Horizon that a direct payment was being made to Ultimate Development for this line item. Had the lender been properly notified in regards to this line item, standard construction lending

procedures call for the lender to adjust the draw disbursement to the builder, setting aside $2,800 to reimburse the borrower for their excess cash in the project. Furthermore, both Dr. Keszler acknowledged that he and Mrs. Keszler signed this draw request, authorizing First Horizon to disburse $8,500.00 to Ultimate Development. Any claim by the Keszlers that First Horizon was at fault is completely incorrect.

Similarly, in regard to Stone Flooring from Stoneco, First Horizon is alleged to have improperly released $18,800. However, the damages claimed in regard to Stone Flooring is $27,636.27, which includes money paid outside of the construction loan draw disbursements for work order 56H-28, which appears to be a payment for upgrades that were paid for by Dr. and Mrs. Keszler and absconded by Ultimate Development. In my opinion, this is not First Horizon's fault. Rather, if consideration is given to the amount of money "improperly released by First Horizon" that was not paid to the subcontractor completing the work, then Dr. and Mrs. Keszler should fully discount any amount they paid directly to Ultimate Development. Therefore, the damages should initially be reduced as described below (as adopted from Delta CPM's chart contained on page 23 of its report):

| Item | Alleged Amount of Improperly Released Money | Amount Received by Subcontractor | Difference or $0 if $0 |
|---|---|---|---|
| Engineering (Harrison Sloan) | $8,500.00 | $8,500.00 | $0.00 |
| Cabinetry (Golden State Interiors) | $32,500.00 | $41,750.00 | $0.00 |
| Doors (California Architectural) | $20,300.00 | $20,000.00 | $300.00 |
| Countertops (Stoneco) | $10,700.00 | $2,870.26 | $7,829.74 |
| Stone Flooring (Stoneco) | $18,800.00 | $5,000.00 | $13,800.00 |
| Plumbing (Waterworks & Ferguson) | $10,200.00 | Unknown | $0.00 |
| Appliances (Ferguson) | $0.00 | $0.00 | $0.00 |
| Radiant Heating (Radiant Tech). | $0.00 | $10,892.00 | $0.00 |
| Drywall (B-12 Drywall) | $32,000.00 | $0.00 | $32,000.00 |
| Voltage (Mountain Built In System) | $8,500.00 | $0.00 | $8,500.00 |
| Framer (Mike Avila) | $15,000.00 | $0.00 | $15,000.00 |
| Retaining Walls | $4,200.00 | $0.00 | $4,200.00 |
| Architectural PreCast Concrete | $11,200 | $0.00 | $11,200.00 |
| Stucco | $34,100.00 | $7,336.00 | $26,764.00 |
| Roof Covering | $77,200.00 | $25,789.00 | $51,411.00 |
| Exterior Windows / Doors | $55,607.27 | Unknown | $0.00 |
| Ornamental Iron | $7,300.00 | $0.00 | $7,300.00 |
| | | | |

"Exterior Windows/Doors," and "Plumbing, Waterworks & Ferguson," should be eliminated from the damage calculation because Delta CMP was unable to determine what amount of the $55,607.27 and $10,200, respectively, was paid to the subcontractor. Accordingly, the amount of damages should be reduced by another $65,807.27, or to $178,304.73.

Further, although the Advance Deposit for "Cabinetry Deposit" dated December 10, 2007 is purportedly forged, the same amount is included in the Draw Requests dated December 10,

2007, which Dr. and Mrs. Keszler claim is signed by them. Therefore, Dr. and Mrs. Keszler improperly include damages in the amount of $9,250 ($300 in the chart above) for "Cabinetry." Similarly, although claiming $32,000 in damages for disbursement for "Drywall," the admittedly signed Draw Request dated March 13, 2008 includes that amount. This reduced the amount another $32,300, or to $146,004.73. Moreover, Dr. and Mrs. Keszler's damages should be further reduced to exclude amounts disbursed by Draw Requests that they would have signed if asked, leaving, by Delta CPM's theory, only potential damages in the amount of $22,700 ("retaining walls, "architectural precast/concrete," and "ornamental iron"). But even that amount should be eliminated, as I have noted above in the Opinion section.

Delta CPM seems to include the amount for architectural precast/concrete upon Dr. Keszler's April 28th Accounting (see tab 5) which states that there is no architectural precast/concrete on the home. The fact that there is no architectural precast/concrete on the home does not make the release of such funds improper by First Horizon. First Horizon received an Advance Deposit request for architectural precast/concrete which seemed to be signed by Dr. Keszler. Appropriately, First Horizons clerical staff made sure that architectural precast/concrete was included in the original budget, which it was on line 139. Therefore, it was proper to release the $11,200 deposit and that amount should also not be included in Dr. and Mrs. Keszler's damage calculation. Dr. and Mrs. Keszler made to attempt to notify First Horizon that this budgeted line item had been eliminated from the construction project. Without this information, First Horizon acted within the terms of the construction loan draw procedures in disbursing the funds.

Similarly, the amount of $7,300 released for ornamental iron was reasonable, as that amount was requested in an Advance Deposit request and was included in the budget and the specifications for the Keszler project. Delta CPM claims that it should not have been released based upon Dr. and Mrs. Keszler's April 28th Accounting because they had not by that time decided upon nor ordered ornamental iron. First Horizon could not have reasonably known of Dr. and Mrs. Keszler's status in regard to choosing ornamental iron and First Horizon's release of the money for a deposit based upon the Advance Deposit request was reasonable and within the construction earnest money deposit parameters of 50% maximum disbursement for deposits.

The inclusion by Delta CPM of amounts released for a retaining wall in September 2007 in its damage calculation is without foundation. Against, Delta CPM relies on Dr. and Mrs. Keszler's April 28th Accounting in which they state that there are no retaining walls on the property. It should be noted that retaining walls are included on the budget at line 117 and were requested, as noted by Delta CPM on the September 3, 2007 Draw Request. The initial report by the inspection company was returned indicating that the retaining wall was not yet started. A follow-up inspection was ordered presumably by a request from Ultimate Development and an e-mail was sent from the inspection company to First Horizon indicating "In response to your call I have updated . . . the Retain Walls/Waterproof/Fill line from 0 to 40%." Since the line item was requested, an inspection revealed it to be 40% completed, and the disbursement was for that amount, First Horizon acted reasonable. It seems that Dr. and Mrs. Keszler has failed to

acknowledge that in the General Specifications section of the Owner/Contractor Agreement , line item 21 states, "Site Retaining Walls/Waterproofing/Backfill. Fixed Cost Item -- Construction of all site retaining walls, per civil engineer or architect's site plan, including proper waterproofing, backfill, and compaction." Includes construction of rear yard retaining walls. From the inspection firm, they acknowledged that this line item was partially completed. Furthermore, Delta CPM indicates that in fact, retaining walls were included in the Keszler house construction, stating that $30,776.00 was paid to EJ Masonry for "retaining walls."

Throughout the Delta CPM report, there are repeated references to cash payments made by Dr. and Mrs. Keszler directly to Ultimate Development, along with reference to work orders and invoices. It appears that Ultimate Development submitted numerous payment requests to Dr. and Mrs. Keszler for upgrades, change orders, or cost overruns that were agreed upon by Dr. and Mrs. Keszler. Thus, there should be no grounds or validity in claiming that First Horizon is at fault for these payments. The following "Work Orders" and invoices are referred to in Delta CPM's report, in the order in which they appear in the report:

| Date | Type | Amount | Description |
|------|------|--------|-------------|
| December 20, 2007 | invoice | $55,465.10 | Work Order #56H-10 for Cabinetry Additions |
| November 16, 2006 | work order | $36,041.21 | interior and exterior doors, no work order referenced |
| April 1, 2008 | invoice | $32,131.75 | Work Order #56-28 for flooring. |
| December 24, 2007 | work order | $27,059.43 | Work Order #56-13 for plumbing. |
| April 1, 2008 | work order | $7,477.49 | Work Order #56H-22 for plumbing fixtures |
| March 11, 2008 | work order | $11,387.30 | Work Order #56H-23 for appliances |
| September 26, 2007 | invoice | $14,274.68 | radiant heating system, no Work Order referenced |
| February 14, 2008 | invoice | $20,831.10 | Work Order #56H-17 for radiant heat. |
| April 1, 2008 | work order | $2,400.00 | Work Order #56H-30 for texture upgrade. |
| April 1, 2008 | work order | $3,696.25 | Work Order #56H-31 for low voltage. |
| March 11, 2008 | work order | $11,934.92 | Work Order #56H-23 for ceiling work. |
| November 17, 2007 | invoice | $2,789.00 | roofing changes, no Work Order referenced |
| September 26 2007 | invoice | $3,789.51 | window changes, no Work Order referenced. |
| | | | |
| | | Total: | $222,698.31 |

The above schedule totals $222,698.31 in work orders and invoices that were made and paid for by Dr. and Mrs. Keszler prior to First Horizon's final draw disbursement in April 2008. In my opinion, it is inappropriate for Delta CPM to disregard any accountability by Keszler for their payments to Ultimate. The most absurd case is in reference to the stone flooring by Stoneco, where a total of $27,636.27 was allegedly embezzled by Ultimate Development. Delta CPM claims that although First Horizon disbursed $18,800, they should be help liable for the additional $13,836.27 that was paid directly by the Keszlers, and furthermore was paid without the knowledge of First Horizon.

**Summary**

In my review of the loan documents, legal documents, depositions, and exhibits First Horizon exceeded standard industry practices in the care and servicing of the Keszler construction loan.

Dr. and Mrs. Keszler have not suffered any damage attributable to First Horizon, as summarized in Table 1 (attached), which I intend to use at the time of trial to summarize my above calculations.  I also intend to use the two tables in this letter to support my calculations.

As additional documents come to light, I may add or alter this report.  Meanwhile, if I can be of further assistance, please feel free to let me know.

Sincerely,

Robert N. McFall

## TABLE 1

| Item | Alleged Amount of Improperly Released Money | Amount Received by Subcontractor | Difference or $0 | Reason for Deduction | Amount of Loss |
|------|------|------|------|------|------|
| Engineering (Harrison Sloan) | $8,500.00 | $8,500.00 | $0.00 | No loss – Amount released equals amount paid to subcontractor for work done. | $0.00 |
| Cabinetry (Golden State Interiors) | $32,500.00 | $41,750.00 | $0.00 | No loss – Amount released is less than amount paid to subcontractor for work done. | $0.00 |
| Doors (California Architectural) | $20,300.00 | $20,000.00 | $300.00 | Included in December 10, 2007 Draw Request | $0.00 |
| Countertops (Stoneco) | $10,700.00 | $2,870.26 | $7829.74 | Work was provided to the project and, therefore, properly released and paid.  Also, Keszlers would have signed draw request if requested. | $0.00 |
| Stone Flooring (Stoneco) | $18,800.00 | $5,000.00 | $13,800.00 | Work was provided to the project and, therefore, properly released and paid.  Also, Keszlers would have signed draw request if requested. | $0.00 |
| Plumbing (Waterworks & Ferguson) | $10,200.00 | Unknown | $10,200.00 | Cannot be included because Keszlers' speculate the amount received by subcontractor/material supplier. | $0.00 |
| Appliances (Ferguson) | $0.00 | $0.00 | $0.00 | Work was provided to the project and, therefore, properly released and paid.  Also, Keszlers would have signed draw request if requested. | $0.00 |
| Radiant Heating (Radiant Tech). | $0.00 | $10,892.00 | $0.00 | Work was provided to the project and, therefore, properly released and paid.  Also, Keszlers would have signed draw request if requested. | $0.00 |
| Drywall (B-12 Drywall) | $32,000.00 | $0.00 | $32,000 | Included in December 10, 2007 Draw Request | $0.00 |
| Voltage (Mountain Built In System) | $8,500.00 | $0.00 | $8,500.00 | Work was provided to the project and, therefore, properly released and paid.  Also, Keszlers would have signed draw request if requested. | $0.00 |
| Framer (Mike Avila) | $15,000.00 | $0.00 | $15,000.00 | Work was provided to the project and, therefore, properly released and paid.  Also, Keszlers would have signed draw request if requested. | $0.00 |
| Retaining Walls | $4,200.00 | $0.00 (none) | $4,200.00 | Included in Draw Request and included in budge as a payable item. | $0.00 |
| Architectural PreCast Concrete | $11,200 | $0.00 (none) | $11,200.00 | Included in Draw Request and included in budge as a payable item. | $0.00 |
| Stucco | $34,100.00 | $7,336.00 | $26,764.00 | Work was provided to the project and, therefore, properly released and paid.  Also, Keszlers would have signed draw request if requested. | $0.00 |
| Roof Covering | $77,200.00 | $25,789.00 | $51,411.00 | Work was provided to the project and, therefore, properly released and paid.  Also, Keszlers would have signed draw request if requested. | $0.00 |
| Exterior Windows/Doors | $55,607.27 | Unknown | $55,607.27 | Cannot be included because Keszlers' speculate the amount received by subcontractor/material supplier. | $0.00 |
| Ornamental Iron | $7,300.00 | $0 (none) | $7,300.00 | Included in Draw Request and included in budge as a payable item. | $0.00 |
| | | **Total:** | **$244,112.01** | | **$0.00** |

# Robert ("Bob") N. McFall

42312 N. Stonemark Drive, Anthem, AZ 85086 • H: 623-551-8046 C: 602-359-3901 • RNMcFall@yahoo.com

## Highlights

- 29 years in bank management. Banking/Lending experience - residential construction, commercial R/E, LA&D, residential mortgage, and business banking. Management experience with national, regional, and community banking organizations.
- Division Manager for residential construction lending products, including design and development, credit/financial analysis, underwriting, policy & procedures, training, draw administration, loan workouts, staff supervision, and loan portfolio management.
- Senior management positions, managing personnel, budgets, loan product lines, policy & procedures, compliance issues, management reports, training, and business development.
- Strong financial/credit analysis and underwriting experience & knowledge. Experience with complex real estate credits, loan structuring, and management (comm'l, LA&D, construction, C-P, mini-perm, and perm financing).

## Work Experience

### Managing Director, The Biltmore Bank of Arizona, Phoenix, AZ.  8-05 to 12-08

- The senior Loan Officer of the Builder & Real Estate Division - Residential new construction, Commercial R/E, LA&D, Mini-perms, builder lines of credit, and C&I lending.
- Oversaw the residential & commercial loan production and the portfolio management. Duties included managing two Business Development Officers, two credit analysts/underwriters, and two draw administration/loan servicing specialists. Worked closely with Credit Administration, Loan Operations, and Loan Servicing departments.
- Residential construction lending products included consumer construction loans (two-time close) and lot lots.
- Residential and commercial construction lending for builders and developers, financing custom new construction, small residential subdivisions, model/spec house, and pre-sold contracts.

### Vice President - Construction Lending Manager, Mortgage Division, First National Bank of Arizona/Nevada, Scottsdale, AZ.  8-02 to 8-05

- Construction Lending Group Manager in the bank's Mortgage Division, managing the residential construction loan products, which included: C-Ps and two-time close construction loans to consumers, consumer lot loans, and builder & investor custom spec home financing for Arizona, Nevada, and New Mexico markets.
- Managed five regional construction loan servicing teams (Phoenix, Havasu City, Las Vegas, Reno, and Albuquerque), overseeing the product design & development, policy & procedures, product parameters & guidelines, underwriting, closing, draw administration, customer service, loan workouts, and other elements of the portfolio management in each region.
- Responsible for product development, quality control, and all sales & underwriting training.
- Managed all problem loans, including draw exceptions, customer/builder disagreements, delinquencies, and loan defaults.
- Provided active support and training to Retail Loan Officers and wholesale brokers in assisting them in selling the department product line. Conducted formal and informal sales training classes.
- Worked closely with loan operations, accounting, secondary marketing, compliance, HR, and the legal staff to upgrade capacity, improve effectiveness, improve reporting system efficiencies, improve customer service, and track performance.

### M&I Bank / First Indiana Bank, Scottsdale, AZ.  8-85 to 3-95 *and* 3-98 to 8-02

**Regional Vice President,** 3-98 to 8-02
- Opened a regional construction lending office in metro Phoenix in 1998.
- Business Development Manager for credit facilities for production builders, land developers, owner-occupied commercial property, custom home builders, and consumer construction products.
- Residential consumer construction products included C-P and two-time construction loans, lot loans, and investor spec loans.  Grew loan production via networking with mortgage bankers and existing custom builder clients.
- Managed all aspects of the office's loan production, portfolio management, and problem loans.
- Supervised two customer service reps, with duties including coordinating loan closing and draw administration.

**Vice President,** 8-85 to 3-95
- Recruited in 1985 to provide leadership in the design and development of a residential construction lending product line.  Product included consumer construction loans (C-Ps, two-time close, lot loans, and investor spec), custom builder spec loans, builder lines of credit, and residential subdivision development financing.
- As the division grew and evolved, my duties grew and expanded.  Initially my duties also included residential mortgage origination and underwriting.  As the division grew, I was promoted to a regional construction lending officer, responsible for all facets of consumer and builder construction loans for the north and east regions.  Duties later expanded to include managing the retail mortgage loan production for the regions.
- Construction lending management duties included:  designing policy & procedure manuals, product guidelines and parameters, underwriting individual loans, training, business development, staff supervision, and designing the majority of the bank's construction loan documents (inspection forms, draw authorizations, construction budget spreadsheets, "approved builder" forms, closing cost worksheets, and draw approval forms).
- Numerous sales and management awards, including:  Bank's "Employee of the Year" in 1993 and President's Club - Six Years.

## Chase Bank / Bank One, Indianapolis, IN.  7/79 to 8-85 *and* 3-95 to 3-98

**Retail Division Vice President,** 7-79 to 8-85.
- Began my banking career as a Branch Manager trainee, moving up through promotions to the Manager of the #2 retail branch (Lawrence, IN) within 5 years.  Bank One was then known as American Fletcher Nat'l Bank.  Managed all aspects of the retail banking center including consumer loans, commercial loans, mortgage loans, and multiple retail banking center locations.

**Senior Vice President,** 3-95 to 3-98.
- National Construction Lending Division Manager for Bank One Mortgage Corp.  Oversaw the consumer construction loan product lines, division personnel, and the management of the portfolio for the entire Bank One Mortgage network (which encompassed 16 states).  Managed staff located in two offices (Indy and Phoenix), totaling 24 associates, including 6 officers/managers.  Worked closely with all senior management and division managers.  Reported to the Mortgage Corp's President -Jeff Gaia.  Key accomplishments included the total overhaul and redesign of the bank's consumer construction loan products, including two C-P loans, a two-time close, and a lot loan.  Worked closely with internal division managers, senior management, and external vendors/partners.

## Education

**Master of Business Administration, Butler University,** Indianapolis, IN  1988
Major:  Business Management

**Bachelor of Science, Indiana University,** Bloomington, IN 1979
Major:  Finance & Economics

## Training

- RMA- Commercial Real Estate, Intermediate Underwriting Course
- RMA - Commercial Lending Credit Analysis Courses
- Sandler Sales Training Program - Brad Ferguson, Scottsdale AZ
- Cohen-Brown Management Training Program
- Dimensions of Professional Selling Training Program

## Affiliations (Current & Past)

- Valley Partnership - Phoenix.
- Risk Management Association - Arizona Chapter (RMA).
- Urban Land Institute - Arizona.
- National Association of Residential Construction Lenders (NARCL) - 1999 to 2005.
- National Association of Home Builders (NAHB) - 1984 to 1998.

## Community Involvement (Current & Past)

- Habitat for Humanity. 2006 to present. Construction worker/volunteer..
- Deer Valley Unified School District. 2007 to present. Serving on a District Task Force studying district-wide growth, planning for future schools, and funding.
- Barry Goldwater High School. 2003 - present. Volunteer.
- Maricopa County Sports Commission - Chairman's Club (special events committee). 1998 to 2004.
- Zionsville Boys and Girls Club, Zionsville, IN. 1995 to 1998. Board of Directors.
- Builders Association of Greater Indianapolis (BAGI). 1985 to 1999. Served on numerous committees, task forces, and work groups.
- IN/KY Conference of the United Church of Christ. Board of Directors. Treasurer. 1988-1994.
- Junior Achievement of Central Indiana. Group Leader & Classroom Instructor. 1982-1989.
- American Banker Association, Instructor - University of Indianapolis. 1983-1987.