1  CARL P. BLAINE (State Bar No. 65229)
   cblaine@wkblaw.com
2  ERIC R. GARNER (State Bar No. 131232)
   egarner@wkblaw.com
3  **WAGNER KIRKMAN BLAINE**
   **KLOMPARENS & YOUMANS LLP**
4  10640 Mather Blvd., Suite 200
   Mather, California 95655
5  Telephone:    (916) 920-5286
   Facsimile:    (916) 920-8608
6
7  Attorneys for Plaintiffs
   ROBERT KESZLER AND
8  JENNIFER CUTTS KESZLER

9              **UNITED STATES DISTRICT COURT**
               **EASTERN DISTRICT OF CALIFORNIA**
10                   **SACRAMENTO DIVISION**

11

12 JENNIFER CUTTS KESZLER, ET AL.,          Case No.:  2:08-CV-02359-LKK-KJM

13          Plaintiff,                       **EXPERT WITNESS REPORT OF**
                                             **DAVID S. MOORE**
14      v.                                   Trial Date:  June 15, 2010

15 FIRST HORIZON HOME LOANS, ET AL.,

16          Defendants.

17

18      Pursuant to the Federal Rules of Civil Procedure 26 (A)(2)(b), JENNIFER KESZLER

19 and ROBERT KESZLER hereby submit the Expert Witness Report of David S. Moore,

20 attached hereto as Exhibit 1.

21 DATED:  September 4, 2009          WAGNER KIRKMAN BLAINE
                                      KLOMPARENS & YOUMANS LLP
22

23
                                  By:    _____Carl P. Blaine_____
24                                       CARL P. BLAINE
                                         Attorneys for
25                                       JENNIFER KESZLER
                                         ROBERT KESZLER
26

27

28
   {13158.00000 / 00447739.DOC.1}          1
   **EXPERT WITNESS REPORT OF DAVID S. MOORE**

DAVID S. MOORE

*Forensic Document Examiner*

MOORE DOCUMENT LABORATORY
9010 BARRHILL WAY
FAIR OAKS, CA 95628

PH. (916) 989-3205 / (800) 989-3205
FAX (916) 989-9674
email: dmoore@mooredocs.com

American Society of
Questioned Document
Examiners

September 3, 2009

DIPLOMATE - American
Board of Forensic
Document Examiners (1978)

American Academy of
Forensic Sciences

Southwestern Association
of Forensic Document
Examiners

Southern Association
of Forensic Scientists

**Mr. David A. Scharlach, Esq.**
Law Offices of Wagner, Kirkman, et al.
10640 Mather Boulevard, Suite 200
Mather, CA 95655

**SUBJECT:**    Report pertaining to Keszler v. First Horizon Bank
(DM-09/174)

## MATERIAL EXAMINED

**EXHIBIT
NUMBER**      **DESCRIPTION OF EXHIBITS**

*(The following documents are part of the Exhibits attached to the
Deposition of Robert Keszler, taken on 5-19-09. They were received
personally from Attorney David A. Scharlach on August 27, 2009.)*

Q1c*      Office machine copy of facsimile copy of signature
page of Draw Request/Direct Disbursement/interim
All Bill's Paid Affidavit depicting questioned
illegible Robert Keszler signature, dated 9-3-07.
*(Deposition Exhibit V)*

Q2c       Office machine copy of facsimile copy of signature
page of Draw Request/Direct Disbursement/interim
All Bill's Paid Affidavit depicting questioned
illegible Robert Keszler and Jennifer Keszler
signatures, dated 10-2-07.   *(Deposition Exhibit Y)*

Q3c       Office machine copy of facsimile copy of signature
page of Draw Request/Direct Disbursement/interim
All Bill's Paid Affidavit depicting questioned
illegible Robert Keszler and Jennifer Keszler
signatures, dated 11-13-07.   *(Deposition Exhibit
AA)*

c* = *copy*

Q4c     Office machine copy of facsimile copy of signature page of Draw Request/Direct Disbursement/interim All Bill's Paid Affidavit depicting questioned illegible Robert Keszler signature, dated 12-12-07. *(Deposition Exhibit DD)*

Q5c     Office machine copy of facsimile copy of signature page of Draw Request/Direct Disbursement/interim All Bill's Paid Affidavit depicting questioned illegible Robert Keszler signature, dated 1-2-08. *(Deposition Exhibit FF)*

Q6c     Office machine copy of facsimile copy of signature page of Draw Request/Direct Disbursement/interim All Bill's Paid Affidavit depicting questioned illegible Robert Keszler and Jennifer Keszler signatures, dated 1-3-08. *(Deposition Exhibit HH)*

Q7c     Office machine copy of facsimile copy of signature page of Draw Request/Direct Disbursement/interim All Bill's Paid Affidavit depicting questioned illegible Robert Keszler and Jennifer Keszler signatures, dated 1-21-08. *(Deposition Exhibit KK)*

Q8c     Office machine copy of facsimile copy of signature page of Draw Request/Direct Disbursement/interim All Bill's Paid Affidavit depicting questioned illegible Robert Keszler and Jennifer Keszler signatures, dated 2-11-08. *(Deposition Exhibit LL)*

Q9c     Office machine copy of facsimile copy of signature page of Draw Request/Direct Disbursement/interim All Bill's Paid Affidavit depicting questioned illegible Robert Keszler signature, dated 2-11-08. *(Deposition Exhibit MM)*

Q10c    Office machine copy of facsimile copy of signature page of Draw Request/Direct Disbursement/interim All Bill's Paid Affidavit depicting questioned illegible Robert Keszler signature, dated 2-11-08. *(Deposition Exhibit NN)*

Q11c    Office machine copy of facsimile copy of signature page of Draw Request/Direct Disbursement/interim All Bill's Paid Affidavit depicting questioned illegible Robert Keszler signature, dated 2-11-08. *(Deposition Exhibit QQ)*

Q12c    Office machine copy of facsimile copy of signature page of Draw Request/Direct Disbursement/interim All Bill's Paid Affidavit depicting questioned illegible Robert Keszler and Jennifer Keszler signatures, dated 2-21-08. *(Deposition Exhibit RR)*

K1(1c-5c)   Office machine copies of various documents
            **_purportedly_** depicting the known signatures of
            Robert T. Keszler, consisting of:

            (1c)  Check no. 106, dated 5-11-07, written on the
                  JPMorgan Chase Bank ProCash Plus Account of
                  Robert T. Keszler & Jennifer H. Cutts-Keszler.
                  *(Deposition Exhibit EE)*
            (2c)  Request for "Advance Deposit" from"
                  Construction Loan Funds for Deposit for
                  Countertop Materials, dated 1-2-08.
                  *(Deposition Exhibit GG)*
            (3c)  Request for "Advance Deposit" from"
                  Construction Loan Funds for Custom floor
                  tiles, dated 2-11-08.  *(Deposition Exhibit OO)*
            (4c)  Request for "Advance Deposit" from"
                  Construction Loan Funds for Custom Counter
                  tops, dated 2-11-08.  *(Deposition Exhibit PP)*
            (5c)  Signature page of Draw Request/Direct
                  Disbursement/Interim All Bill's Paid
                  Affidavit, dated 3-13-08.  *(Deposition Exhibit
                  SS)*

   K2       *(This exhibit designation was not used in this
            report.)*

K3(1c-26c)  Copies of various documents depicting the known
            signatures of Robert Keszler and Jennifer Cutts
            Keszler, consisting of:

            (1c)  Signature page of Stipulation for Judgment
                  and Settlement, dated 6-13-08.  *(Deposition
                  Exhibit C)*
            (2c)  Check no. 116, dated 11-17-07, written on the
                  JPMorgan Chase Bank ProCash Plus Account of
                  Robert T. Keszler & Jennifer H. Cutts-Keszler.
                  *(Deposition Exhibit F)*
            (3c)  Signature page of Owner/Contractor Agreement,
                  dated 5-23-07.  *(Deposition Exhibit G)*
            (4c)  Signature page of Cost Breakdown, dated 5-22-07.
                  *(Deposition Exhibit G)*
            (5c)  Signature page of General Specifications,
                  dated o/a 5-22-07.  *(Deposition Exhibit G)*
            (6c)  Signature page of 2004 Keszler Revocable
                  Trust, dated 5-6-04.  *(Deposition Exhibit H)*
            (7c)  Signature page of Deed of Trust, dated 7-27-07.
                  *(Deposition Exhibit I)*
            (8c)  Inter Vivos revocable Trust as Borrower –
                  Acknowledgment, undated.  *(Deposition Exhibit
                  I)*
            (9c)  Signature page of Planned Unit Development
                  Rider, dated 7-27-07.  *(Deposition Exhibit I)*



3

(10c)   Signature page of Fixed/Adjustable Rate
        Rider, dated 7-27-07.  *(Deposition Exhibit I)*

(11c)   Signature page of Inter Vivos Revocable Trust
        Rider, undated.  *(Deposition Exhibit I)*

(12c)   Signature page of Residential Construction
        Loan Rider Including Security Agreement to
        the Deed of Trust/Mortgage, undated.
        *(Deposition Exhibit I)*

(13c)   Signature page of Interest – Only Period
        Adjustable Rate Note, undated.  *(Deposition
        Exhibit J)*

(14c)   Signature page of Residential Construction
        Loan Allonge to Note, undated.  *(Deposition
        Exhibit J)*

(15c)   Prepayment Penalty Rider to Construction Loan
        Note California, dated 7-27-07.  *(Deposition
        Exhibit J)*

(16c)   Draw Procedures, dated 5-5-07.  *(Deposition
        Exhibit K)*

(17c)   Signature page of Residential Construction
        Loan Agreement, dated7-27-07.  *(Deposition
        Exhibit N)*

(18c)   Signature page of Rider to:  Residential
        Construction Loan Agreement; and Residential
        Construction Mortgage Loan Contractor's
        Affidavit, dated 7-27-07.  *(Deposition
        Exhibit N)*

(19c)   Retainage Agreement, undated.  *(Deposition
        Exhibit O)*

(20c)   Machine printed letter pertaining to
        Borrower's request for a 5% retention, dated
        7-26-07.  *(Deposition Exhibit P)*

(21c)   Contractor/Builder Disclosure, dated 7-27-07.
        *(Deposition Exhibit Q)*

(22c)   Borrower's Consent to Advances to Contractor,
        dated 7-27-07.  *(Deposition Exhibit R)*

(23c)   Indemnity, dated 7-27-07.  *(Deposition
        Exhibit S)*

(24c)   Signature page of Draw Request/Direct
        Disbursement/Interim All Bill's Paid
        Affidavit, dated 8-12-07.  *(Deposition
        Exhibit T)*

(25c)   Request for "Advance Deposit" from"
        Construction Loan Funds for Window / Door
        Deposit Paid, dated 9-3-07.  *(Deposition
        Exhibit W)*

(26c)   Signature page of Draw Request/Direct
        Disbursement/Interim All Bill's Paid
        Affidavit, dated 12-10-07.  *(Deposition
        Exhibit CC)*

## PURPOSE OF EXAMINATION

Determine whether Robert Keszler, whose known signatures are *purportedly* contained within those documents listed as K1(1c-5c) and K3(1c-26c), wrote the questioned illegible Robert Keszler signatures depicted on Q1c through Q12c.  Additionally, determine whether Jennifer Cutts Keszler, whose known signatures are contained within K3(1c-26c), wrote the questioned "Jennifer Keszler" signatures depicted on Q2c, Q3c, Q6c, Q7c, Q8c and Q12c.

## RESULTS OF EXAMINATIONS

1.  There are indications that Robert Keszler, K1(1c&5c*) and K3(1c-26c**), may not have written the illegible "Robert Keszler" signatures depicted on Q1c, Q4c, Q5c, Q9c, Q10c, Q11c and K1(2c-4c).

2.  The questioned illegible "Robert Keszler" and "Jennifer Keszler" signatures (as well as the "Kevin Javaheri" signatures) depicted on Q2c, Q3c, Q6c, Q7c, Q8c and Q12c are the identical signatures depicted on K3(24c).  The only appreciable difference between all of these documents is the different date entries.  In other words, the document bearing the original, genuine signatures of Robert Keszler, Jennifer Keszler and Kevin Javaheri (or a copy of that document) which was faxed as the K3(24c) copy was used as the model to create the Q2c, Q3c, Q6c, Q7c, Q8c and Q12c documents.

## BASIS AND REASONS FOR OPINIONS

Handwriting identification is based on the premise that handwriting embodies features and characteristics which, in combination, are sufficiently personal to serve as the basis for identification.  In other words, no two individuals write alike and an individual can be associated and identified with his or her handwriting.

*  – *Although submitted as known documents that purportedly depicted the genuine illegible signatures of Robert Keszler, those exhibits listed and marked as K1(2c-4c), in reality depicted illegible signatures that, while they bore a striking similarity to the other known Robert Keszler signatures, contained significant differences that suggested they had actually been written by someone who was attempting to "simulate" (i.e. copy) Robert Keszler's signature.*

**–*The "known" illegible Robert Keszler signature depicted on K1(5c) is a very poor reproduction.  The poor quality of this signature precludes any determination as to its genuineness and, therefore, it was not considered in this examination .*

While it is an acknowledged fact that not all writing is identifiable, a writing can be identified if it is of sufficient length and complexity and if a sufficient body of comparable known writing is available for evaluation. Conversely, there are some writings that are of either insufficient length or complexity that they do not lend themselves to identification.

In this case, all of the submitted questioned or known documents were copies, rather than originals. Examination of originals is always preferable, as copies often preclude a complete evaluation of the entire document. While some copies are appreciably better quality than others, copies often preclude definitive conclusions in certain types of examinations.

This case presented two types of questioned documents:

(1)  **Group No. 1.**  Those questioned documents that only depicted questioned signatures of Robert Keszler, i.e. Q1c, Q4c, Q5, Q9c, Q10c and Q11c. (Additionally, as mentioned in the first footnote on the preceding page, this case presented documents that depicted signatures that were initially submitted as the known signatures of Robert Keszler that, upon examination, were determined to contain sufficient dissimilarities to support the belief that they were actually simulations of Mr. Keszler's genuine signatures and they had been actually written by someone other than Mr. Keszler.)

(2)  **Group No. 2.**  Those questioned documents that depicted both the questioned signatures of Robert Keszler and Jennifer Keszler, i.e. Q2c, Q3c, Q6c, Q7c, Q8c and Q12c.

Those questioned illegible "Robert Keszler" signatures in Group No. 1 were considered first.

## GROUP NO. 1

An initial evaluation of the questioned Robert Keszler signatures in Group No. 1 suggested that they appeared to be rapidly executed with speed and fluency and with a moderate amount of skill. This evaluation was conducted with the use of hand held magnifiers to evaluate the detail within the signatures that was present within the copies. It was noted that, for the most part, the questioned signatures were illegible and relatively simplistically created. It was also noted that all of these questioned documents were copies of facsimile copies and, hence, much of the more subtle features of the handwriting could not be evaluated.

This initial evaluation also failed to detect whether these questioned signatures contained any of the "classic" signs of either simulation or tracing, such as slowness and hesitations, careful retouching, blunted initial and terminal strokes, evenness of pressure, unnatural pen lifts, tremor, etc.  This aspect of the examination is relevant to the extent that slowly drawn, awkward writing often is not identifiable, while naturally executed handwriting facilitates the examination and identification process.  It is important to note, however, that many of these handwriting aspects could not be properly evaluated due to the poor quality of these questioned signatures.

Next, the purported "known" signatures of Robert Keszler depicted on K1(1c-5c) and K3(1c-26c) were considered.  As mentioned above, these signatures were also copies.  Each of these signatures was evaluated with appropriate lighting and magnification and each was inter-compared with each other to insure that they were all written by the same individual.

The process of inter-comparison of known signatures is important because, occasionally, writings are submitted that may pertain to the individual, but they may not have been written by that person.  The possibility that the submitted known writings may have actually been written by more than one person must always be considered and it is of concern since it is one of the major reasons why mistakes are made by qualified examiners.

While the known Robert Keszler signatures displayed a relatively wide "range of variation", with several significant exceptions as noted below, they each fell within an acceptable habit pattern and they were considered to be an adequate, representative sample of Mr. Keszler's known signature from the time period at issue.  Each of the known signatures appeared to be written with speed and fluency and with a skill and fluency that appeared somewhat commensurate with the questioned signatures.  These known signatures were also written in a simplistic and illegible style and they were generally pictorially similar to the questioned signatures.

During this comparative process, it was noted that those purportedly known signatures depicted on K1(2c-4c) contained several features that were not consistent with the remaining known signatures.  These dissimilar features were sufficiently important to suggest that this particular group of three signatures may not have been written by Robert Keszler.  Therefore, they were initially excluded from the remaining known signatures.

One of the remaining known signatures, i.e. K1(5c), was a very poor quality reproduction and the lack of recorded detail precluded any determination regarding its genuineness.

7

Therefore, the K1(5c) signature was removed from any further consideration in this case.

Ultimately, the remaining known Robert Keszler signatures, i.e. K1(1c) and K3(1c-26c) were all considered to be writing of the same individual.  Furthermore, they were considered to be adequate in quantity and, therefore, they could provide the basis for a comparative examination with the questioned signatures in Group No. 1.

Attention was then returned to the questioned signatures in Group No. 1 and a detailed study was conducted on each of them. Within the limits imposed by copies of facsimile copies, handwriting features and characteristics such as speed of execution, fluency, height relationships, spacing, letter construction, introductory and terminal strokes, direction of strokes, the presence or absence of diacritics, pressure patterns, pen position, placement, baseline habits, writing instrument, presence or absence of tremor or hesitation, pen lifts, and class and individualizing features were considered and evaluated.  As previously mentioned, however, many of the more subtle aspects of the signatures could not be evaluated because they had been lost in the copying processes.

During this portion of the evaluation processes, it was noted that some of the same features and variation found within the questioned signatures of Group No. 1 were also present within the excluded group of the three signatures that had originally been submitted as known signatures, i.e. K1(2c-4c).  Therefore, the K1(2c-4c) signatures were included within the Group No. 1 questioned signatures.

Upon completion of this portion of the examination, it appeared that the questioned signatures, including K1(2c-4c), appeared to have been written with some elements of speed.  Furthermore, even though they were relatively short and simplistically and illegibly written, appeared they appeared to contain some individualizing features that were sufficiently individualistic to provide the basis for a proper comparative examination with the remaining known body of signatures.

A comparative examination was then conducted between the questioned and known signatures to consider the possibility that they might be of common authorship.  All of the questioned signatures, including K1(2c-4c), bore a general similarity to the known group of signatures.

When similarities exist between questioned and known signatures, a limited number of possibilities can exist regarding the issue of genuineness:  i.e. logically, the questioned signatures can only be one of the following possibilities:

- a *simulation* (i.e. an attempt to imitate by drawing),
- a *tracing*,
- a physical or electronic "*cut and paste*", or
- *genuine*.

The possibility of a "*slowly executed simulation*" was initially considered. In this possibility, a genuine signature is present and is used by the writer as the model to emulate. The examination disclosed that none of the "classic" signs of simulation (e.g. slow tremulous writing, blunt beginning and ending strokes, careful retouching, evenness of pressure throughout, unusual pen lifts, etc.) could be detected within any the questioned signatures. However, as noted above, the relatively poor quality of these copied questioned signatures precluded a proper evaluation. In this case, while the questioned signatures were generally pictorially similar to the known signatures, they were found to be dissimilar in several salient aspects. Therefore, the possibility of a slowly drawn simulation could not be entirely discounted.

The possibility of a "*rapidly written simulation*" was also considered. In a rapidly written simulation, a genuine signature is also present. The simulator often considers and attempts to capture the genuine signature's most obvious features, such as capital letters, overall slant, size and any embellishing strokes. What the simulator often fails to observe or understand are the smaller, more subtle and, therefore, the more identifiable features of the handwriting. Aspects such as internal spacing and height relationships, direction of stroke, pressure patterns and the like are often omitted or accomplished incorrectly. In this case, the questioned signatures, while they appeared generally similar to the known signatures, they disagreed with them in several significant aspects. Therefore, the possibility of a rapidly executed simulation could not be discounted.

A "*simulation from memory*" was then considered. In this alternative, the simulator is already familiar with the genuine signature that is going to be simulated. but does not have a model present. The absence of a genuine signature often results in a simulation which deviates from the model individual's in significant ways and it is more likely to contain some of the actual writing habits of the simulator. Ultimately, this alternative form of simulation could not be discounted since, as mentioned above, the questioned signatures disagreed in several important aspects with the known signatures.

The possibility of a *tracing* was next considered. The act of tracing is an unnatural writing act in that the writing is not spontaneously executed. Often, tracings contain many, if not all, of the "classic" signs associated with slowly drawn

9

simulations.  Since the questioned signatures contained several significant features not found within the known signatures, the option of tracing was eliminated as a logical possibility.

The next consideration was either a physical or an electronic "cut and paste".  In these possibilities a genuine signature is "cut" from an existing document and "pasted" onto another document.  An examination of each of the questioned signatures disclosed, however, that they contained features that were not found within the body of genuine signatures of Robert Keszler.  Therefore, the possibility of cut and paste was also logically excluded.

The last logical option - that the questioned signatures had actually been written by Mr. Keszler - was finally considered. As previously mentioned, the undersigned looked for any evidence that suggested that these signatures were either genuine or not genuine.  Several features were found that strongly suggested the Group No. 1 signatures (including K1[2c-4c]) may not have been written by Mr. Keszler.  The presence of these features within the questioned signatures of Group No. 1 and K1(2c-4c) supported the belief that these signatures may not have been written by Mr. Keszler.

The questioned signatures of Group No. 1 and K1(2c-4c) possessed the following individualizing features and characteristics that supported the conclusion that they were logically all written by one individual who was attempting to simulate the genuine signature of Mr. Keszler:

- The entire signature appears to be written in one, continuous movement.
- The signature is illegible and appears to represent a large number "2" with a long tail.
- The introductory stroke of the "2" portion of the signature begins above the baseline in an upward movement.
- Often that introductory stroke goes uphill at an angle of about 70° while other times it starts with a short, slightly curved upstroke that is somewhat shallower.
- The introductory stroke continues upward until it changes to a downward, clockwise direction with a rounded curve.
- The change of direction at the top of the "2" occurs at about 1 or 2 o'clock.
- The upper curve of the "2" continues downward and goes through the baseline.
- After going through the baseline, the letter form again changes direction in a clockwise upward movement.
- Often the "2" begins directly above what becomes the leftmost portion of the eyelet at the bottom left of the "2" while sometimes the eyelet at the bottom of the "2" is farther to the left than the beginning stroke.

10

- After crossing the baseline in the upward movement, the "2" continues upward until it intersects with the down stroke of the "2", resulting in a relatively long, narrow eyelet.
- The eyelet that is formed at the intersection slants uphill from left to right.  Sometimes that angle is sharp (about 80°uphill) while other times it is more shallow (about 30° uphill).
- After the intersection with the down stroke, the illegible signature terminates with a relatively long ending stroke to the right that ends above the baseline.
- Sometimes the ending stroke terminates with a downward movement; sometimes it ends with a horizontal movement and sometimes it ends with a short, upward movement.

The known illegible Robert Keszler signatures, while generally pictorially similar to the questioned Robert Keszler signatures of Group No. 1 and K1(2c-4c), contain the following dissimilar features and characteristics that support the conclusion that the questioned signatures were logically all written by one individual who was attempting to simulate the genuine signature of Mr. Keszler:

- The beginning stroke of known Keszler signatures most often begin in a straight, 90° upward movement.  **In contrast**, the angle of the beginning strokes of the Group No. 1 questioned "2"s is much shallower.
- The upward stroke changes in a clockwise direction at the top of the "2" in a rounded movement.  This change of direction occurs at approximately 12 o'clock.  **In contrast**, the angle at the top of the "2" of the Group No. 1 questioned "2"s is at approximately 1 to 2 o'clock.
- While the down stroke of the "2" occasionally violates the baseline, most frequently the bottommost portion of the "2" is somewhat horizontal and it moves to the left.  **In contrast**, the bottom of the Group No. 1 questioned "2"s always violates the baseline and the movement does not become horizontal before it again changes direction.
- The bottom left of the "2" changes direction in a clockwise movement in a slightly uphill direction.  **In contrast**, the changes of direction at the bottom left of the Group No. 1 questioned "2"s have a much sharper upward angle.
- The "2" continues slightly upward to the right until it intersects with the down stroke and the long, narrow mostly horizontal eyelet that creates a sharp emphasis on the left side.  **In contrast**, the eyelets that are formed in the Group No. 1 questioned "2"s are at a much steeper angle.

11

- The eyelet that is formed at the bottom of the "2" is distinctly farther to the left in relation to the location of the beginning stroke of the "2". **In contrast**, the leftmost portion of the eyelets in the Group No. 1 questioned signatures is about even with or just slightly to the left of the location of the beginning stroke of the "2".
- Generally, the ending stroke of the strokes of the illegible signature are longer in relation to the "2" portion of the signature.  In contrast, the ending strokes of the Group No. 1 signatures are generally slightly shorter.

## GROUP NO. 2

Group No. 2 consisted of the following questioned documents: Q2c, Q3c, Q6c, Q7c, Q8c and Q12c.  Each of these documents depicted questioned "Robert Keszler" and "Jennifer Keszler".

During an initial evaluation of the Group No. 2 questioned documents, it was noted that, with a few exceptions, the purported signatures of Robert and Jennifer Keszler appeared to represent the same two signatures of those individuals.  A comparison of the genuine sets of signatures by Robert and Jennifer Keszler confirmed that, while those signatures were similar to one another, in a number of ways they were absolutely different from one another.  These types of absolute differences are expected when evaluating genuine signatures.

One of the tenants of handwriting identification is that no two individuals possess the same sets of handwriting attributes, i.e. "no two people write alike."

Another tenant of handwriting identification is that no one individual writes exactly the same way twice.  In other words, variation exists in genuine writing that results in absolute differences between genuine signatures.

A comparison of the Group No. 2 questioned signatures of Robert Keszler disclosed that they were sufficiently similar to one another to conclude that they all had a common source.  A comparison of the Group No. 2 questioned signatures of Jennifer Keszler disclosed that they were sufficiently similar to one another to conclude that they also had a common source.

During an examination of the known documents, a document was located that depicted the same two Robert and Jennifer Keszler signatures that were depicted on the Group No. 2 set.  This was the document marked and listed as K3(24c).  In other words, the signatures of Robert and Jennifer Keszler depicted on K3(24c) were the same Robert and Jennifer Keszler signatures depicting on the Group No. 2 documents.

Furthermore, the K3(24c) known document and the Group No. 2 questioned documents were also the same in other handwritten information depicted on these documents:

- The illegible "Kevin Javaheri" signature was the same on all of these documents.
- The large lined out "0" depicted to the left of center was the same on all of these documents.
- The lined out illegible "Robert Keszler" signature at the bottom was the same on all of these documents.

The only appreciable difference between the K3(24c) document and the Group No. 2 documents was the different sets of dates associated with the Keszlers' signatures.  In addition a number of the Group No. 2 documents had additional handwritten entries that were not present on K3(24c), e.g.:

- Q6c had the date "01/02/08" associated with the Javaheri signature.
- Q7c had the hand printed name "Kevin Javaheri", the title "President" and the date "1/21/08" associated with the illegible Javaheri signature.
- Q8c had the date "2-11-08" associated with the Javaheri signature and well as the date "2-11-08" associated with the lined out illegible "Robert Keszler" signature.
- Q12c had the hand printed name "Kevin Javaheri", the title "President" and the date "02/21/02" associated with the illegible Javaheri signature.

The determination that the "Robert Keszler" and "Jennifer Keszler" signatures depicted on K3(24c) were the same signatures that were depicted on all of the Group No. 2 documents (as well as the other in-common signatures and handwritten information) determines that the original (or a copy) of the document used to created the K3(24c) fax document was the source of the Group No. 2 documents.  Said in another way, Robert and Jennifer Keszler signed their signatures on the original of what became the K3(24c) facsimile copy and those same signatures depicted on K3(24c) were used as the sources for the corresponding signatures depicted on the documents that became the Group No. 2 documents (Q2c, Q3c, Q6c, Q7c, Q8c and Q12c).  Said in yet another way, the Keszler's never signed any of the Group No 2 documents; the original (or a copy) of the K3(24c) document was used as the source to create the Group No. 2 documents.

## REMARKS

In the event the "originals" of the questioned and known documents can be obtained, more definitive conclusions may result with respect to the issue of the genuineness of the Group No. 1 questioned Robert Keszler signatures.

Attached as **Exhibit "A"** is a copy of the undersigned's
Curriculum Vitae.

Attached as **Exhibit "B"** are copies of the undersigned's expert
witness testimony for the years 2005 to present date.

Attached as **Exhibits "C" through "N"** are copies of those
documents listed and identified as Q1c through Q12c.

Attached as **Exhibit "O"** is a copy of a "cut and paste" chart
that depicts, at the top above the horizontal dividing line,
enlarged copies of the questioned illegible Robert Keszler
signatures from Group No. 1 and, at the bottom below the line,
enlarged copies of the three (3) illegible Robert Keszler
signatures from K1(2c-4c).  Each of the enlarged signatures is
preceded by the exhibit designation and followed by the date of
the respective source document.  This chart depicts the
similarities that exist between these signatures that indicate
they may have been written by the same, unidentified writer.

Attached as **Exhibit "P"** is a "cut and paste" chart that
depicts, in two columns, the genuine illegible signatures of
Robert Keszler.  Each of the enlarged signatures is either
preceded or followed by the exhibit designation and the date of
the respective source document.  This chart, coupled with the
Exhibit "O" chart, depicts the dissimilarities that exist
between the signatures on Exhibit "O" and the signatures on
Exhibit "P" that indicate they may have been written by the
different writers.

Attached as **Exhibit "Q"** is a "cut and paste" chart that
depicts, at the top above the dividing line, the set of Robert
and Jennifer Keszler signatures from K3(24c) and, below the
line, the same sets of Keszler signatures from the Group No. 2
documents.  Each of the enlarged signatures is preceded by the
exhibit designation and followed by the date of the respective
source document.  This chart depicts the identical sets of
signatures that exist on each of these documents that determine
that they are all from a common source.

The findings expressed above, i.e. "indications may not have
written" and "did not write" are  two of nine distinct
probability statements that are used to express different
degrees of certainty.  These terms are defined in the American
Society of Testing and Materials (ASTM) International Standard,
E 1658 (*Standard Terminology for Expressing Conclusions of
Forensic Document Examiners*).  The undersigned ascribes to the
definitions contained in this published standard.  Attached as
**Exhibit "R"** to this report is a copy of Standard E 1658.

## STATEMENT OF FEES

I bill my examination and conference times at $250.00 per hour
and my testimony time (whether in trial, hearing or deposition)
at $300.00 per hour.

## DISPOSITION OF MATERIAL EXAMINED

All evidence will be temporarily retained pending disposition
instructions.

**DAVID S. MOORE**
**Forensic Document Examiner**

Encl:  *as*

15

# DAVID S. MOORE

## Forensic Document Examiner

MOORE DOCUMENT LABORATORY
9010 BARRHILL WAY
FAIR OAKS, CA 95628

PH.  (916) 989-3205 / (800) 989-3205
FAX  (916) 989-9674
email:  dmoore@mooredocs.com

American Society of
Questioned Document
Examiners

## CURRICULUM VITAE

DIPLOMATE - American
Board of Forensic
Document Examiners, Inc.

Southwestern Association
of Forensic Document
Examiners

### August 2008

American Academy of
Forensic Sciences

Southern Association
of Forensic Scientists

| | |
|---|---|
| **FORMAL EDUCATION** | B.S., Criminal Justice, University of Nebraska, Omaha, NB; 1972 (4.0 GPA). M. Ed., Adult Education, Georgia Southern College, Statesboro, Georgia; 1976 (4.0 GPA). |
| **PROFESSIONAL TRAINING** | Questioned Document Course, US Army Criminal Investigation (CID) Laboratory, Fort Gordon, GA; *Jan. 1974 - Dec. 1975*. US Secret Service Questioned Document Course, Washington, D.C.; Nov. 1975. Survey of Questioned Documents, Federal Bureau of Investigation, Quantico, VA; Jul. 1975. |

Questioned Documents Examination Proficiency Tests, Crime Laboratory
Proficiency Testing Program:   1984, 1985, 1986, 1987, 1988, 1989, 1990,
1991, 1992, 1993, 1995, 1996, 1997, 1998 (tests 9806 & 9814), 1999 (tests
99-521 & 99-524), 2000 (tests 00-521 & 00-524), 2001 (test 01-521), 2003
(test 03-521).

ABFDE Business Records Workshop; ASQDE Meeting, Ashville, NC; Aug. 2008.

Typography - Testing to Testimony Workshop, ASQDE Meeting, Ashville, NC; Aug.
2008.

Authenticating Questioned Documents Seminar, ASQDE Meeting, Boulder, CO; Aug.
2007

Photoshop Class, Southwestern Association of Forensic Document Examiners
Meeting, Tempe, AZ; Sep. 2006

How *Frye* and *Daubert* Have Changed the Presentation of Criminalistics and
Questioned Documents in Court Workshop; American Academy of Forensic
Sciences (AAFS) Meeting, Seattle, WA; Feb. 2006.

Digital Output Devices & Forensic Examination of Electrophotographic
Documents Workshops, Southwestern Association of Forensic Document
Examiners (SWAFDE) Fall Meeting, Golden, CO; Oct. 2004.

Adobe Photoshop for Forensic Document Examiners, American Academy of Forensic
Sciences (AAFS) Meeting, Dallas, TX, Feb. 2004.

Practical Digital Photography Workshop, AAFS Meeting, Atlanta, GA; Feb. 2002.

Tour of Scientific Games, Security Printing Company That Produces Lottery
Tickets & Games, AAFS Meeting, Atlanta, GA; Feb. 2002.

Paper Science Related to Questioned Documents Workshop, AAFS Meeting, Atlanta,
GA; Feb. 2002.

Detection of Counterfeit Documents Workshop, SWAFDE Fall Meeting, Tempe, AZ;
Sep. 2001.

Forensic Examination of Typographic Documents Workshop, SWAFDE Fall Meeting,
Tempe, AZ; Sep. 2001.

History of Handwriting, Basic Calligraphy, Sketching, and Signature Workshop;
SWAFDE Spring Meeting, Monterey, CA; Mar. 2001.

1

EXHIBIT A

CURRICULUM VITAE (Cont'd)

| | |
|---|---|
| **PROFESSIONAL TRAINING** (Cont'd) | The 2nd International Symposium on the Forensic Examination of Questioned Documents (sponsored by the FBI), Albany, NY, Jun. 1999.<br><br>National Conference on Science and the Law, San Diego, CA, Apr. 1999.<br><br>Medical Record Examination Advance Study Workshop (sponsored by ABFDE), San Diego, CA, Mar. 1998.<br><br>Difficult & Complex Handwriting Examinations Seminar, (sponsored by the ABFDE), Burlingame, CA, Jan. 1997.<br><br>Managing Your Private Practice Seminar, SWAFDE 15th Anniversary Conference, Tucson, AZ, Oct. 1996.<br><br>The Fifth Annual National Expert Witness And Litigation Seminar, Hyannis, MA; Jun. 1996.<br><br>Video Spectral Examinations:  Imaging Documents Throughout the Spectrum Workshop, AAFS Meeting, Nashville, TN; Feb. 1996.<br><br>Digital Image Processing for Questioned Document Examiners Workshop, AAFS Meetings, Seattle WA; Feb. 1995 & Nashville, TN; Feb. 1996.<br><br>Questioned Document Reference Database and Typewriter Classification Database Workshop, AAFS Meeting, Seattle, WA; Feb. 1995.<br><br>Fluorescence and Luminescence Techniques in Questioned Documents Symposium, California Criminalistics Institute (CCI), CA Department of Justice, Sacramento, CA; Feb. 1992.<br><br>Courtroom Presentation of Evidence Class, CCI, CA Department of Justice, Sacramento, CA; Oct. 1991.<br><br>Laser Seminar, Southern California Laser Study Group, Downey, CA; Feb. 1990.<br><br>Photocopier Workshop, AAFS Meeting, Philadelphia, PA; Feb. 1988.<br><br>Questioned Documents Signature Seminar, AAFS Meeting, Philadelphia, PA; Feb. 1988. |
| **RELEVANT WORK EXPERIENCE** | 1994-Present:  Full-time private practice as proprietor of *Moore Document Laboratory*, Fair Oaks, CA.<br><br>1984-1994:  Questioned Document Examiner II, California Department of Justice, Sacramento, CA.<br><br>1982-1984:  Examiner of Questioned Documents, Las Vegas Metro. Police Criminalistics Laboratory, Las Vegas, NV.<br><br>1980-1982:  Senior Questioned Document Analyst, Southern Region US Postal Crime Lab, Memphis, TN<br><br>1980:  Questioned Document Examiner II, California Department of Justice, Sacramento, CA.<br><br>1978-1979:  Chief, Questioned Documents Section, US Army CID Laboratory, Fort Gordon, GA.<br><br>1976-1978:  Examiner of Questioned Documents, US Army CID Laboratory, Fort Gordon, GA.<br><br>1974-1975:  Questioned Document Student, US Army CID Lab., Fort Gordon, GA.<br><br>*1965-1979:*  Special Agent, US Army Criminal Investigations (CID) Agency. |
| **CERTIFICATE** | Board Certified (and Tested) as "Diplomate" of the American Board of Forensic Document Examiners (ABFDE); since 1978.  (*Certificate #13*) |
| **PROFESSIONAL MEMBERSHIPS/ OFFICES HELD** | The American Academy of Forensic Sciences (AAFS), Fellow, since 1975.<br><br>The Southern Association of Forensic Scientists (SAFS), Member, since 1975.<br><br>The Southwestern Association of Forensic Document Examiners (SWAFDE), Member, since 1985.<br><br>The American Society of Questioned Document Examiners (ASQDE) since 2008.<br><br>Northern California Laser Study Group, Member from 1988 - 1994.<br><br>American Society of Testing & Materials (ASTM), Member since 1997. |

CURRICULUM VITAE (Cont'd)

| | |
|---|---|
| PROFESSIONAL<br>MEMBERSHIPS/<br>OFFICES HELD<br>(Cont'd.) | Document Examiners of Northern California Study Group (DENC) since 1997.<br>Coalition of Private Practice Examiners (COPPE), Member since 1997.<br>National Honor Society of Phi Kappa Phi, Member since 1976.<br>Director of the Board of ABFDE; 1999- 2002.<br>Director of the Board of Forensic Specialty Accreditation Board; 2000 -2002.<br>Northern Pacific Regional Representative of SWAFDE; 1998-2003.<br>Northern California Regional Representative of SWAFDE; 1997.<br>Proficiency Testing Committee, SWAFDE, Chairperson, 1989/90.<br>Continuing Education Committee, ABFDE, Chairperson, 1999-2002.<br>Editorial Staff of the Southwestern Examiner, Member, 1992.<br>Public Relations Committee, SWAFDE, Member, 1996/1997.<br>COPPE Representative at Scientific Working Group – Documents (SWGDOC)<br>  Subcommittee for Standard Operating Procedures and Terminology, Apr. 1999. |

PROFESSIONAL
MEETINGS

American Academy of Forensic Sciences (AAFS): 1975, 1978, 1980, 1981, 1984, 1985, 1986, 1987, 1988, 1991, 1993, 1995, 1996, 1998, 2000, 2002, 2003, 2004 & 2005.

American Society of Question Document Examiners (ASQDE):  1976, 1983, 1988, 1989, 1990, 1994, 1997, 2001, 2007 & 2008.

International Association for Identification (IAI): 1988.

Southwestern Association of Forensic Document Examiners (SWAFDE):  Spr. 1983, Fall 1985, Fall 1986, Fall 1987, Spr. & Fall 1988, Fall 1989, Spr. 1990, Spr. & Fall 1991, Spr. 1992, Spr. 1993, Spr. 1994, Spr. & Fall 1996, Fall 1997, Spr. & Fall 1998, Spr. & Fall 1999, Spr.& Fall 2000, Spr. & Fall 2001, Spr. & Fall 2002, Spr. 2003, Spr. & Fall 2004, Spr. & Fall 2005, Spr. & Fall 2006,Fall 2007, Spr. 2008.

California State Div. of the International Association for Identification, 1986.

Southern Association of Forensic Sciences (SAFS): 1974, 1978, 1979 & 1982.

California Association of Criminalists (CAC): Spr. 1989.

California State Technical Exchange Program (STEP): 1985, 1989, 1990 & 1991.

Northern California Laser Study Group:  Nov. 1988, Mar. 1989, Oct. 1989, Jul. 1990, Sep. 1990, Mar. 1991, May 1992, Jan. 1993, & Feb. 1994.

Document Examiners of Northern California (DENC) Study Group:  Mar., Jun. & Sep. 1997; Jan., Mar. & Jul. 1998; Mar. & Nov. 1999; Aug. 2000 & May 2003.

American Society of Testing & Materials (ASTM) Subcommittee E30.02 Questioned Documents:  1998 & 2002.

National Conference on Science and the Law:  Apr. 1998; Oct. 2000.

PROFESSIONAL
PAPERS

An Unusual Signature.  Presented at the 1975 Meeting of SAFS.

A Comprehensive Two-Year Training Program for Questioned Document Examiners. Presented at the 1976 Conference of ASQDE.

- Determining the Sequence of Ball-Point Pen Writings – A New Method? Presented at the 1977 Meeting of AAFS and Published in Jan. 1978, Journal of Forensic Sciences.

- The Importance of Shading Habits in Handwriting Identification – A Case Study. Presented at the Fall 1978 Meeting of SAFS and Published in Jan. 1983, Journal of Forensic Sciences.

- Evaluation of a Method to Detect the Site of Rubber Erasures by Powder. Presented at the Fall 1979 Meeting of SAFS and Published in Oct. 1981, Journal of Forensic Sciences.

- The Identification of an Office Machine Copy of a Printed Copy of a Photographic Copy of an Original Sales Receipt.  Presented at the 1981 Meeting of AAFS and Published in Jan 1982, Journal of Forensic Sciences.

- Handprinted Notes from a 13-Year-Old Boy.  Presented at the Spring 1983 Meeting of SWAFDE.

CURRICULUM VITAE (Cont'd)

| | |
|---|---|
| **PROFESSIONAL**<br>**PAPERS**<br>**(Cont'd.)** | A Case Study of the Dangers of Office Machine Copiers:  Beware of Self-Serving Standards.  Presented at the 1983 Conference of ASQDE.<br>The Importance of Originals: Two Typewriter Case Histories.  Presented at the Fall 1985 Meeting of SWAFDE.<br>The Electrostatic Detection Apparatus (ESDA) and its Effects on Latent Prints on Paper.  Presented at the 1986 Meeting of CSDIAI and 1987 Meeting of AAFS and Published in Mar. 1988, Journal of Forensic Sciences. |

- Obtaining Original Typewriter Specimens – A Case Study.  Presented at the 73rd Annual Conference (1988) of IAI.
- Conspiracy to Surreptitiously Provide False Nonrequest Known Writings.  Presented at the 1989 Meeting of STEP, the 1989 Conference of ASQDE and the Fall 1989 Meeting of SWAFDE.
- The Appearance of Selective Differentiation of Homogenous Ball Pen Ink Lines by Reflected Infrared Irradiation.  Presented at the 1989 Conference of ASQDE and Published in the 1990 Vol. 45 issue of the Forensic Science International under the title:  Abnormalities Encountered in Infrared Examinations of Ball Pen Writing Over Correction Fluid.
- Page to Book Association Using the Electrostatic Detection Apparatus (ESDA).  Presented at the Spring 1990 Meeting of SWAFDE and 1991 Meeting of AAFS.
- VSC-1 Resolves Confusion between Carbon and Ink Lines.  Presented at the Spring 1990 Meeting of SWAFDE, the Jul. 1990 Northern California Laser Study Group and the 1990 Meeting of ASQDE.
- Rainbow Pencils.  Presented at the Spring 1990 Meeting of SWAFDE, the 1990 Meeting of STEP, the 1990 Meeting of ASQDE and the 1991 Meeting of AAFS.
- Would You Believe a .308 Caliber Pen?  Presented at Spring 1991 Meeting of SWAFDE and the 1991 Meeting of STEP.
- The Care and Feeding of ESDA Documents.  Presented at the Spring 1991 Meeting of SWAFDE.
- How to Select a Forensic Document Examiner, Published in the Summer 1991 Vol. 10, No. 2 issue of the Southwestern Examiner; the Summer 1991 issue of  The Litigator; the December 1993-January 1994 issue of San Francisco Attorney; in the Fall 1994 Vol. 1, Issue 3 of the Bar Briefs newsletter of the Sonoma County, CA Bar Assoc.; in the Spring 1995, Vol. XVI, No. 2 issue of The Manuscript Society News; in the Oct/Dec 1995, Vol. 1, No. 4, issue of the International Journal of Forensic Document Examiners; included as an enclosure to the January 1997 information pamphlet of the ABFDE.
- Two Pens, One Signature.  Presented at Spring 1992 Meeting of SWAFDE.
- An Identification of an Elimination.  Presented at Spring 1993 SWAFDE Meeting.
- The Invalid Application of Valid Techniques.  Presented at the 65th Annual Conference of the ASQDE, Boulder, CO, Aug. 2007 & the Spr. 2008 Meeting of the SWAFDE, San Diego, CA, Apr. 2008.

| | |
|---|---|
| **COURT**<br>**TESTIMONY** | I have appeared, qualified and testified as an expert in the field of questioned documents in Justice, Municipal, Superior, Federal and Military courts and in Administrative Hearings, as well as in depositions and arbitrations, *in excess of 625 times* in more than 20 states within the United States, including a majority of the counties within California. |
| **TEACHING**<br>**EXPERIENCE** | I have presented numerous classes on a variety of questioned document topics to federal, state and local attorneys and law enforcement officials; banking and insurance personnel; private civic organizations and individuals. |
| **SPECIAL**<br>**AWARDS** | The *Legion of Merit*, US Army, 1980, for services while Chief of the Questioned Document Section, US Army Criminal Investigation Laboratory, Ft. Gordon, GA. |

# DAVID S. MOORE

## TESTIMONY IN 2005

| DATE | CASE NO(S). | CASE TITLE | TYPE OF COURT / LOCATION |
|---|---|---|---|
| 1-10-05 | 1-03-CV000994 / DM-04/199 | Shaffer v. Comfort | Deposition / Sacramento, CA |
| 2-9-05 | C03-02894 / DM-04/194 | Dinsdale v. Halaszynski, et al | Superior Court / Martinez, CA |
| 3-3-05 | D03-06103 / DM-04/237 | Marriage of Carlson | Deposition / Walnut Creek, CA |
| 3-11-05 | 04AS02199 / DM-04/232 | Morgan v. Benavidez | Deposition / Sacramento, CA |
| 3-25-05 | 03AS02741 / DM-05/106 | Nehemiah Progresive Housing Development v. Harris, et al | Deposition / Elk Grove, CA |
| 4-5-05 | 1-03-CV-011268 / DM-05/121 | Dalton & Corbin v. Century 21 ALPHA' Joanie Francis; Diane Lamberty, et al. | Deposition / San Jose, CA |
| 4-15-05 | 325147 / DM-05/122 | Kelly-Moore Paint Co., Inc., v. Continental Insurance Co., et al | Deposition / San Francisco, CA |
| 4-22-05 | 1-03-CV-011268 / DM-05/121 | Dalton & Corbin v. Century 21 ALPHA' Joanie Francis; Diane Lamberty, et al. | Superior Court / San Jose, CA |
| 5-13-05 | NASD 99-01985 / DM-01/134 | Regency Outdoor Advertising v. Bear, Stearns & Company | NASD Hearing Board / Los Angeles, CA |
| 6-15-05 | FL 338947 / DM-05/138 | Schenk v. Calder | Superior Court / Stockton, CA |
| 7-22-05 | SM241269A / DM-05/136 | People v. Timothy Cooper | Superior Court / Stockton, CA |
| 9-1-05 | C 03-03850 JF (PVT) / DM-04/224 | Edward Scarff, et al. v. Jackson National Life Insurance Company | Deposition / Oakland, CA |
| 9-28-05 | S CV 14283 / DM-05/120 | Gonzalez v. Auburn Honda, et al. | Deposition / Roseville, CA |
| 10-17-05 | 01AS04979 / DM-05/212 | Waltrip, et al. v. Kimberlin, et al. | Deposition / Sacramento, CA |
| 11-3-05 | 1-03-CV-005150 / DM-05/206 | Moore v. Warden; Warden v. Moore, et al. | Deposition / San Jose, CA |
| 11-8-05 | 01AS04979 / DM-05/212 | Waltrip, et al. v. Kimberlin, et al. | Superior Court / Sacramento, CA |
| 11-16-05 | n/a / DM-05/214 | Dodds v. Neillo Auto Company | Private Arbitration / Sacramento, CA |

EXHIBIT ℬ

2-8-05     02PR00567 / DM-05/128     Estate of Inga Ida Terry                      Superior Court / Sacramento, CA

12-27-05           / DM-05/226       Estate of James B. Olson                     Deposition / San Jose, CA

**DAVID S. MOORE**

**TESTIMONY IN 2006**

| DATE | CASE NO(S). | CASE TITLE | TYPE OF COURT / LOCATION |
|------|-------------|------------|--------------------------|
| 1-13-06 | SCV 14439 /DM-05/240 | Luis v. Taylor, et al | Deposition / Sacramento, CA |
| 2-7-06 | CR 03-0095 WBS / DM-98/189 | U. S. v. Amyr Mohsen, et al. | Federal Court / San Francisco, CA |
| 2-9-06 | CV 023154 / DM-05/210 | Kamali v. Guardino | Superior Court /Stockton, CA |
| 2-13-06 | 1:04-CR-424-RWS / DM-05/213 | U. S. v. William C. Campbell | Federal Court / Atlanta, GA |
| 3-9-06 | CV025847 / DM-06/118 | Thompson v. Abrams, et al. | Deposition / Stockton, CA |
| 3-16-06 | 24431 / DM-05/244 | Estate of Curtis Eugene Moore | Superior Court / Redding, CA |
| 3-20-06 | 04AS01747 / DM-06/105 | Hernandez v. Benevidez | Deposition / Sacramento, CA |
| 3~ 22-06 " | CV 812749 / DM-02/224 C03 03394 JF/PVT / " C03 04829 JF/PVT / " C03 05871 JF/HRL ? " | Comerica Bank v. Scarff Scarff v. Wells Fargo Bank, Comerica Bank, et al. | Deposition / San Francisco, CA " / " " " |
| 3-23-06 | CV-254278 SPC / DM-06/113 | Jess Smith & Sons Cotton, LLC v. Mark Costa | Deposition / Fresno, CA |
| 4-26-06 | CO4 1682 MHP / DM-05/144 | Salas v. Hilltop Financial Mortgage, et al. | Deposition / Walnut Creek, CA |
| 5-4-06 | 1-02-CV813200 / DM-05/186 | Duncalf v. Holomon | Deposition / Sonora, CA |
| 5-20-06 | 04AS01747 / DM-06/105 | Hernandez v. Benevidez | Deposition / Sacramento, CA |
| 5-22-06 | CV-254278 SPC / DM-06/113 | Jess Smith & Sons Cotton LLC v. Costa | Superior Court / Bakersfield, CA |
| 6-22-06 | CI 53360 / DM-96/169 | Rauch v. Robinson | Superior Court / Red Bluff, CA |
| 6-26-06 | 05CC07154 / DM-06/151 | Walker (Estate of Nguyen) v. Sphinx Alarm & Communication, L.P., et al. | Deposition / Sacramento, CA |
| 8-11 7-06 | 256135-LPE / DM-06/160 | Khatkar & Kaur, et al. v Dhillon, et al. | Deposition / Bakersfield, CA |

# DAVID S. MOORE

## TESTIMONY IN 2006 (Cont'd)

| DATE | CASE NO(S). | CASE TITLE | TYPE OF COURT / LOCATION |
|------|-------------|-----------|--------------------------|
| 8-29-06 | 06F04809 / DM-06/173 | People v. Harold Green, Jr. | Parole Revocation Hearing / Sacramento, CA |
| 9-7-06 | FFL081727 / DM-05/116 | Marriage of Sholberg | Superior Court /Fairfield, CA |
| 10-11-06 | 05CECG02060 / DM-06/184 | Naranjo v. Huang | Deposition / Sacramento, CA |
| 11-1-06 | 05AS01318 / DM-06/188 | Miranda v. Duenas | Deposition / Sacramento, CA |
| 11-15-06 | 2006-AIR-0014 / DM-06/161 | Douglas v. Sky West Airlines, et al. | Trial, US Dept. of Admin Law Judge /Salt Lake City, UT |
| 11-20-06 | 1-06-PR-159378 / / DM-06/191 | In the Matter of the Trust of Charles Green | Superior Court / San Jose, CA |
| 12-13-06 | A523080 / DM-05/157 | Smith v. Tintier, et al. | Deposition / Las Vegas, NV |
| 12-14-06 | CJV051026 / DM-06/209 | WTI Systems & Services, Inc. v. Sanchez | Superior Court / San Rafael, CA |
| 12-19-06 & 12-27-06 | C06-028SL & C06-029SL / DM-05/238 | Office of Citizen's Complaints v. Officer Scott Biggs & SGT John Bragagnolo | Special Hearing / San Francisco, CA |

# DAVID S. MOORE

## TESTIMONY IN 2007

| DATE | CASE NO(S). | CASE TITLE | TYPE OF COURT / LOCATION |
|---|---|---|---|
| 1-9-07 | 05AS00227 / DM-06/158 | Friedman v. Corbella & Turczynski | Superior Court / Sacramento, CA |
| 1-10-07 | VCF 03-117251 / DM-06/101 | People v. Refugio Ruben Cardenas | Superior Court / Visalia, CA |
| 1-12-07 | 05AS00227 / DM-06/158 | Friedman v. Corbella & Turczynski | Superior Court / Sacramento, CA |
| 3-8-07 | 373251 / DM-06/157 | Naidu v. Prasad | Superior Court / Modesto, CA |
| 3-28-07 | PR-05-00039 / DM-07/119 | Morra v. Menard | Superior Court / Hollister, CA |
| 4-24-07 | JAMS # 11100009736 / DM-07/137 | Morgado v. Brannon | Deposition / Campbell, CA |
| 5-9-07 | 03AS05745 / DM-04/239 | Maria D. v. Comcast, et al. | Deposition / Sacramento, CA |
| 5-__-1-07 | 25896 / DM-07/142 | Estate of Bernadine Gail Moore | Superior Court / Merced, CA |
| 5-24-07 | L-2006080228 / DM-06/199 | In the Matter of the Accusation Against Zanka Manchevak, DDS | Administrative Hearing / San Diego, CA |
| 6-25-07 | CU0700001 / DM-06/197 | Menard v. Lopez (Morra) | Superior Court / Hollister, CA |
| 8-1-07 | CV 052980 / DM-07/164 | Brenlar Investments, Inc., dba Frank Howard Allen Realtors v. Lynch, et al. | Deposition / San Francisco, CA |
| 9-7-07 | CV 052980 / DM-07/164 | Brenlar Investments, Inc., dba Frank Howard Allen Realtors v. Lynch, et al. | Superior Court / San Rafael, CA |
| 10-4-07 | 06CECG01843MWS / DM-07/120 | Gutierrez v. Sciaroni, et al. | Deposition / Sacramento, CA |
| 10-11-07 | VG04143957 / DM-07/147 | Smith v. Davis | Deposition / Sacramento, CA |
| 10-18-07 | SCV 239753 / DM-07/158 | Peeler v. Malone | Superior Court / Santa Rosa, CA |
| 11-29-07 | C-05-02055 / DM-07/193 | Baca v. Baca | Superior Court / Martinez, CA |

# DAVID S. MOORE

## TESTIMONY IN 2008

| DATE | CASE NO(S). | CASE TITLE | TYPE OF COURT / LOCATION |
|---|---|---|---|
| 1-18-08 | HG06298155 / DM-07/139 | Purcell v. Salimi | Superior Court / Martinez, CA |
| 1-31-08 | 06AS000419 / DM-07/125 | Rosemont Plaza v. Baddawi | Arbitration / Sacramento, CA |
| 2-19-08 | A527468 / DM-07/128 | Paulsen v. Kearney | Superior Court / Las Vegas, NV |
| 3-3-08 | PES-07-289565 / DM-07/148 | In Re. the Estate of Vivian C. Barrett | Deposition / San Francisco, CA |
| 5-20-08 | PR38176 / DM-08/137 | Estate of Jack William Moon, Sr. | Superior Court, Chico, CA |
| 5-29-08 | 106CV067859 / DM-07/202 | Tu v. Tran | Superior Court / San Jose, CA |
| 6-17-08 | 289523 / DM-06/159 | Estate of Wilson v. Williams | Superior Court / San Francisco, CA |
| 6-24-08 | CV53017 / DM-07/165 | Houk v. Tuolumne General Hospital & Dr. Stephen J. Hopkins | Deposition / Sacramento, CA |
| 7-7-08 | CGC-07-465613 / DM-08/133 | Rodriguez v. Rabanus | Deposition / San Francisco, CA |
| 7-9-08 | MP 18793 / DM-08/150 | In re. Doris M. Prust | Superior Court / Monterey, CA |
| 7-10-08 | 06PR00394 / DM-07/184 | In re the Matter of the Rau Family Trust; Rau, et al. v. Holmes, et al. | Superior Court / Sacramento, CA |
| 8-25-08 | SPR 5003 / DM-08/138 | Estate of James Lowell Wheeler | Superior Court / Roseville, CA |
| 9-18-08 | CV 07-5675 GW (SHx) / DM-08/157 | Sullivan v. Salazar, et al | Deposition / Sacramento, CA |
| 10-15-08 | RP06291380 / DM-07/163 | 1994 Grubb Family Revocable Trust | Superior Court / Oakland, CA |
| 10-28-08 | PR6667 / DM-08/139 | Estate of Martha R. Eck | Superior Court / San Andreas, CA |

## DAVID S. MOORE

## TESTIMONY IN 2009

| DATE | CASE NO(S). | CASE TITLE | TYPE OF COURT / LOCATION |
|---|---|---|---|
| 1-6-09 | SC086679 / DM-08/122 | Neinstein, et al. v. Mitchell, Silverberg & Knupp, et al. (Estate of Lawrence & Marcia Isreal) | Deposition / Los Angeles, CA |
| 2-2-09 | P 26355 / DM-09/200 | The Pearl Bertinoia Trust | Superior Court / Merced, CA |
| 2-24-09 | FL05-1459 / DM-08/206 | Landes v. Landes (Marriage of Landes) | Yolo County, CA Superior Court / Auburn, CA |
| 4-2-09 | 07AS01511 / DM-09/114 | U. S. Bank, et al. v. Westernair Mechanical Services, Inc., et al. | Deposition / Sacramento, CA |
| 4-27-09 | M 89366 / DM-08/108 | Calamia v. Calamia | Superior Court / Monterey, CA |
| 5-6-09 | F 06904532-9 / DM-09/129 | People v. Morris | Superior Court / Fresno, CA |
| 5-8-09 | SCV22997 / DM-09/121 | Nguyen v. Truong | Deposition / Sacramento, CA |
| 6-4-09 | MPR012232 & MPR012297 / DM-08/105 | In the Matter of The Rubin Blech Living Trust & In the Matter of the Estate Of Rubin Blech, et al. v Waldine Blech | Deposition / Madera, CA |
| 6-5-09 | SCV23461 / DM-09/134 | Austin v. Pham | Deposition / Sacramento, CA |
| 6-8-09 | 143745 / DM-08/191 | Tri Counties Bank v. Petrovich | Superior Court / Chico, CA |
| 6-25-09 | 34-2008-00006436 / DM-09/116 | You Never Know LLC v. U. S. Bank, et al. | Deposition / Sacramento, CA |
| 7-13-09 | SPR 5238 / DM-09/145 | In Re the Matter of the Estate of Ellis Wendell Fuller | Deposition / Concord, CA |
| 7-15-09 | 34-2008-00006436 / DM-09/116 | You Never Know LLC v. U.S. Bank, et al. | Superior Court / Sacramento, CA |
| 7-27-09 | DM-08/192 | Malik v. Souza, et al. | Deposition / Stockton, CA |

## DAVID S. MOORE

### TESTIMONY IN 2009 (Cont'd)

| DATE | CASE NO(S). | CASE TITLE | TYPE OF COURT / LOCATION |
|------|-------------|------------|--------------------------|
| 7-28-09 | Y0051643 / DM-09/139 | K/S Shadow Mountain Partners I, et al. William W. Adams, et al. | Deposition / Los Angeles, CA |

2

9/ 4/ 0/ TUE 17:29   Ultimate Dev      [916939/859       /197  566309        # 3/ 8

The person(s) signing this Affidavit is/are personally liable for any loss or damage resulting from any false or incorrect information given on this form.

CONTRACTOR: Ultimate Development, Inc.          BORROWER: Robert & Jennifer Keszler

Name   Kevin Javaheri                Signature    Robert Keszler        Date  9-3-07

By:
Signature                            Signature    Jennifer Keszler              Date
In:
Title
Date:


## CHANGE ORDER REQUEST
### (Must be signed in addition to Draw Request)

Change Order #_____     Total Amount of This Change Order $_____

Description of Changes

_____     $_____

_____     $_____

_____     $_____

_____     $_____

_____     $_____

Above described change orders are approved and accepted by both borrower and builder.

Change order #_____ will be paid from:

_____   Directly from borrower to builder.

_____   *Request use of contingency reserve funds to pay entire Change Order.
             (Funds from contingency reserve will be paid based on inspection report
             of completed Change Order items, overall completion % of project and funds
             remaining in said reserve.)

_____   Other (Describe)_____


Builder Signature                    Borrower Signature         Date


Date                                 Borrower Signature         Date


EXHIBIT  C

The borrower signing this Affidavit is/are personally liable for any loss or damage resulting from any false or incorrect information given on this form.

CONTRACTOR: Ultimate Development, Inc.                BORROWER: Robert & Jennifer Koester

Name: David Ireland                    Signature: Robert Koester          Date: 10-2-07

By: _____                   Signature: Jennifer Koester        Date: 10-2-07

Signature: _____

Title: _____

Date: _____                                                     92 #

## CHANGE ORDER REQUEST
### (Must be signed in addition to Draw Request)

Change Order # _____    Total Amount of This Change Order $ _____

Description of Changes

_____    $ _____

_____    $ _____

_____    $ _____

_____    $ _____

_____    $ _____

Above described change orders are approved and accepted by both borrower and builder.

Change order # _____ will be paid from:

_____ Directly from borrower to builder.

_____ *Request use of contingency reserve funds to pay entire Change Order.
(Funds from contingency reserve will be paid based on inspection report
of completed Change Order items, overall completion % of project and funds
remaining in said reserve.)

_____ Other (Describe) _____

Builder Signature _____    Borrower Signature _____    Date

Date _____                  Borrower Signature _____    Date

FH-1056

EXHIBIT D

11/13/'07 TUE 23:53  Ultimate Dev    [916]397859    ]19252566309    # 3/ 6

You personally signing this Affidavit inherently personally liable for any loss or damage resulting from any false or incorrect information given on this form.

CONTRACTOR: Ultimate Development, Inc.    BORROWER: Robert & Jennifer Kessler

Name _____    Signed _____ 11/13/07
                                        Robert Kessler    Date
By: _____     Signed _____ 11/13/07
Signature                              Jennifer Kessler    Date
Title _____
Date _____                               Q3

### CHANGE ORDER REQUEST
(Must be signed in addition to Draw Request)

Change Order # _____    Total Amount of This Change Order $ _____

Description of Changes

_____ $ _____
_____ $ _____
_____ $ _____
_____ $ _____
_____ $ _____

Above described change orders are approved and accepted by both borrower and builder.

Change order # _____ will be paid from:

____ Directly from borrower to builder.

____ *Request use of contingency reserve funds to pay entire Change Order.
     (Funds from contingency reserve will be paid based on inspection report
     of completed Change Order items, overall completion % of project and funds
     remaining in said reserve.)

____ Other (Describe) _____

Builder Signature _____    Borrower Signature _____  Date _____

Date _____            Borrower Signature _____  Date _____

**FH-1033**

EXHIBIT E

12/11/ 07 TUE 01:56  ULTIMATE DEV     [9105597099]       71925255559       04/ /7/ 8

JUL. 12. 2007  2:01PM   FIRST HORIZON           NO. 7879   P. 2

## INDEMNIFICATION TO FIRST HORIZON HOME LOANS

### Request for "Advance Deposit" from" Construction Loan Funds

Borrowers Names: Robert & Jennifer Keszler

Vendor/Supplier: Goolden State Interiors

Loan Number(s): 6112141 4

Property Address: 4877 Moreau Ct. El Dorado Hills    9576z

To First Horizon Home Loans:

This is a written request by the Borrower(s) of the above stated construction project for an "advance deposit" of construction funds. The reason is stated below.

We the Borrower(s) do hereby indemnify & hold harmless First Horizon Home Loans from any action that may result (i.e.: borrower does not receive from the Vendor/Supplier in a timely manner, or the failure of the Vendor/Supplier to perform and furnish the anticipated materials; or any dispute that may arise between the borrower and the Vendor/Supplier of any kind). The Borrower(s) of the above stated construction project understand and agree that the "Advance Deposit" from funds in the Construction loan is contrary to the safe secure advance policies generally held by First Horizon, and agree that in making this accommodation should it become necessary the borrower(s) will immediately advance their own funds to First Horizon Home Loans to replenish the Construction Account with all funds so advanced, upon written request to do so. First Horizon is relying on this request and indemnification solely as a basis for granting the request, and the borrower(s) understand this is based upon the receipts and/or estimates furnished by the borrower(s) and First Horizon has not verified the validity or accuracy, other than requiring a copy of such.

Reason for Request:

Cabinetry Deposit (50%)

Line Item # from Budget: _____ 46

Dollar Amount for Request: $ ____ 32,500

Borrower: _____  Date: 12/10/07

Borrower: _____  Date: _____

(Advance 2-23-08)



FH-1006

EXHIBIT  F

1/ 2/ 08 WED 21:55  Ultimate Dev    (916939/859    )1925256609    # 7/ 8

JUL. 12. 2007  2:01PM  FIRST HORIZON    NO. 7879  P. 2

## INDEMNIFICATION TO FIRST HORIZON HOME LOANS

### Request for "Advance Deposit" from" Construction Loan Funds

Borrowers Names: _Koszler_

Vendor/Supplier: _California Architectural Traditions_

Loan Number(s): _6121414_

Property Address: _4873 Moreau Ct. El Dorado Hills_

To First Horizon Home Loans:

This is a written request by the Borrower(s) of the above stated construction project for an "advance deposit" of construction funds. The reason is stated below.

We the Borrower(s) do hereby indemnify & hold harmless First Horizon Home Loans from any action that may result (i.e.: borrower does not receive from the Vendor/Supplier in a timely manner; or the failure of the Vendor/Supplier to perform and furnish the anticipated materials; or any dispute that may arise between the borrower and the Vendor/Supplier of any kind). The Borrower(s) of the above stated construction project understand and agree that the "Advance Deposit" from funds in the Construction loan is contrary to the safe secure advance policies generally held by First Horizon, and agree that in making this accommodation should it become necessary the borrower(s) will immediately advance their own funds to First Horizon Home Loans to replenish the Construction Account with all funds so advanced, upon written request to do so. First Horizon is relying on this request and indemnification solely as a basis for granting the request, and the borrower(s) understand this is based upon the receipts and/or estimates furnished by the borrower(s) and First Horizon has not verified the validity or accuracy, other than requiring a copy of such.

Reason for Request:

_OK to fund for deposits for interior & exterior doors_ _Deposit for doors (special order)_

Line item # from Budget: _3B_ & _4B_

Dollar Amount for Request: $ _3750 + 6400_

Borrower: ___  Date: _1-2-08_

Borrower: ___ _95.~_  Date:

_KWooldredge 1/4/08_

(Advance 2-23-08)

 EXHIBIT FF
Deponent Koszler
Date 5/13/09 Rptr BK

FH-0893

EXHIBIT G

The person(s) signing this Affidavit is/are personally liable for any loss or damage resulting from any false or incorrect information given on this form.

CONTRACTOR: Ultimate Development, Inc.

Name: Kevin Javahari

By:
Signature
Its:
Title:
Date: 01/02/06

BORROWER: Robert & Jennifer Keszler

Signature  Robert Keszler   Date  1-2-06
Signature  Jennifer Keszler  Date  1-2-06

### CHANGE ORDER REQUEST
(Must be signed in addition to Draw Request)

Change Order #_____   Total Amount of This Change Order $_____

Description of Changes

$_____
$_____
$_____
$_____
$_____

Above described change orders are approved and accepted by both borrower and builder.

Change order #_____ will be paid from:

_____ Directly from borrower to builder.

_____ *Request use of contingency reserve funds to pay entire Change Order.
(Funds from contingency reserve will be paid based on inspection report
of completed Change Order items, overall completion % of project and funds
remaining in said reserve.)

_____ Other (Describe)_____

Builder Signature _____        Borrower Signature _____   Date _____

Date _____                     Borrower Signature _____   Date _____

FH-090D

EXHIBIT H

1/22/ 08 TUE 18:23   Ultimate Dev      (916999/859    71925256309    # 3/  6

The person(s) signing this Affidavit is/are personally liable for any loss or damage resulting from any false or incorrect information given on this form.

CONTRACTOR: Ultimate Development, Inc.     BORROWER: Robert & Jennifer Kessler

Name: Kevin Javaheri                       Signature: Robert Kessler         Date: 1-21-08

By: Kevin Javaheri                         Signature: Jennifer Kessler       Date: 1-21-08
Signature

Its: President                                                               Q7

Title

Date: 1/21/08

## CHANGE ORDER REQUEST
### (Must be signed in addition to Draw Request)

Change Order #_____    Total Amount of This Change Order $_____

Description of Changes

| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |
| | $_____ |

Above described change orders are approved and accepted by both borrower and builder.

Change order #_____ will be paid from:

_____ Directly from borrower to builder.

_____ *Request use of contingency reserve funds to pay entire Change Order. (Funds from contingency reserve will be paid based on inspection report of completed Change Order items, overall completion % of project and funds remaining in said reserve.)

_____ Other (Describe)_____

Builder Signature                 Borrower Signature           Date

Date                              Borrower Signature           Date

FH-0972

EXHIBIT I

2/13/ 08 WED 03:26  Ultimate Dev    (916939/859    ) 19252566309    # 3/ 16

The person(s) signing this Affidavit is/are personally liable for any loss or damage resulting from any false or incorrect information given on this form.

CONTRACTOR: Ultimate Development, Inc.    BORROWER: Robert & Jennifer Keszler

Name: Kevin Javaheri
By:
Signature
By:
Title
Date: 2-11-08

Signature: Robert Keszler    Date 2-11-08
Signature: Jennifer Keszler    Date 2-11-08

## CHANGE ORDER REQUEST
### (Must be signed in addition to Draw Request)

Change Order #_____    Total Amount of This Change Order $_____

Description of Changes

_____    $_____
_____    $_____
_____    $_____
_____    $_____
_____    $_____

Above described change orders are approved and accepted by both borrower and builder.

Change order #_____ will be paid from:

_____ Directly from borrower to builder.

_____ *Request use of contingency reserve funds to pay entire Change Order.
(Funds from contingency reserve will be paid based on inspection report
of completed Change Order items, overall completion % of project and funds
remaining in said reserve.)

_____ Other (Describe)

Builder Signature _____    Borrower Signature _____    2-11-08 Date

Date _____    Borrower Signature _____    Date

EXHIBIT  J

2/13/ 08 WED 03:28   ULTIMATE DEV      (919597899         11929256869     # 10/ 16

JUL. 12. 2007  2:01PM  FIRST HORIZON                      NO. 7879  P. 2

## INDEMNIFICATION TO FIRST HORIZON HOME LOANS

### Request for "Advance Deposit" from" Construction Loan Funds

Borrowers Names: _Kessler_

Vendor/Supplier: _Vineyard Stone_

Loan Number(s): _6112141H_

Property Address: _4873  Morean  Ct._

To First Horizon Home Loans:

This is a written request by the Borrower(s) of the above stated construction project for an "advance deposit" of construction funds. The reason is stated below.

We the Borrower(s) do hereby indemnify & hold harmless First Horizon Home Loans from any action that may result (i.e: borrower does not receive from the Vendor/Supplier in a timely manner; or the failure of the Vendor/Supplier to perform and furnish the anticipated materials; or any dispute that may arise between the borrower and the Vendor/Supplier of any kind). The Borrower(s) of the above stated construction project understand and agree that the "Advance Deposit" from funds in the Construction loan is contrary to the safe secure advance policies generally held by First Horizon, and agree that in making this accommodation should it become necessary the borrower(s) will immediately advance their own funds to First Horizon Home Loans to replenish the Construction Account with all funds so advanced, upon written request to do so. First Horizon is relying on this request and indemnification solely as a basis for granting the request, and the borrower(s) understand this is based upon the receipts and/or estimates furnished by the borrower(s) and First Horizon has not verified the validity or accuracy, other than requiring a copy of such.

Reason for Request:

_Production  deposit  for  architectural_

_concrete_

Line Item # from Budget: _39_

Dollar Amount for Request: $ _11,200_

Borrower: _[signature]_ Date: _2-11-08_

Borrower: _99.52_ Date:

(Advance 2-23-06)



JT EXHIBIT MM
Deponent Kessler
Date 5/19/09 Rptr TK
WWW.DEPOBOOK.COM

FH-0940

EXHIBIT  K

JUL. 12. 2007  2:01PM   FIRST HORIZON                        NO. 7879   P. 2

## INDEMNIFICATION TO FIRST HORIZON HOME LOANS

### Request for "Advance Deposit" from" Construction Loan Funds

Borrowers Names:  _Kesler_

Vendor/Supplier:  _Salome's Iron Works_

Loan Number(s):  _611 21414_

Property Address:  _4873 Moreau Ct._

To First Horizon Home Loans:

This is a written request by the Borrower(s) of the above stated construction project for an "advance deposit" of construction funds. The reason is stated below.

We the Borrower(s) do hereby indemnify & hold harmless First Horizon Home Loans from any action that may result (i.e.: borrower does not receive from the Vendor/Supplier in a timely manner; or the failure of the Vendor/Supplier to perform and furnish the anticipated materials; or any dispute that may arise between the borrower and the Vendor/Supplier of any kind). The Borrower(s) of the above stated construction project understand and agree that the "Advance Deposit" from funds in the Construction loan is contrary to the safe secure advance policies generally held by First Horizon, and agree that in making this accommodation should it become necessary the borrower(s) will immediately advance their own funds to First Horizon Home Loans to replenish the Construction Account with all funds so advanced, upon written request to do so. First Horizon is relying on this request and indemnification solely as a basis for granting the request, and the borrower(s) understand this is based upon the receipts and/or estimates furnished by the borrower(s) and First Horizon has not verified the validity or accuracy, other than requiring a copy of such.

Reason for Request:

_Custom iron work_

Line Item # from Budget:  _41_

Dollar Amount for Request:  $ _7300_

Borrower:                                    Date: _2-11-08_

Borrower:                    _PK_     Date:

(Advance 2-23-08)



DX EXHIBIT _nn_
Deponent _Kesler_
Date _5/14/08_ Rptr _PK_
WWW.DEPOBOOK.COM

FH-0942

EXHIBIT  _L_

JUL. 12. 2007  2:01PM  FIRST HORIZON                    NO. 7879  P. 2

## INDEMNIFICATION TO FIRST HORIZON HOME LOANS

### Request for "Advance Deposit" from" Construction Loan Funds

Borrowers Names: _Keszler_

Vendor/Supplier: _Hubrecht Lighting_

Loan Number(s): _61121414_

Property Address: _4873 Moreni Ct_

To First Horizon Home Loans:

This is a written request by the Borrower(s) of the above stated construction project for an "advance deposit" of construction funds. The reason is stated below.

We the Borrower(s) do hereby indemnify & hold harmless First Horizon Home Loans from any action that may result (i.e.: borrower does not receive from the Vendor/Supplier in a timely manner; or the failure of the Vendor/Supplier to perform and furnish the anticipated materials; or any dispute that may arise between the borrower and the Vendor/Supplier of any kind). The Borrower(s) of the above stated construction project understand and agree that the "Advance Deposit" from funds in the Construction loan is contrary to the safe secure advance policies generally held by First Horizon, and agree that in making this accommodation should it become necessary the borrower(s) will immediately advance their own funds to First Horizon Home Loans to replenish the Construction Account with all funds so advanced, upon written request to do so. First Horizon is relying on this request and indemnification solely as a basis for granting the request, and the borrower(s) understand this is based upon the receipts and/or estimates furnished by the borrower(s) and First Horizon has not verified the validity or accuracy, other than requiring a copy of such.

Reason for Request:

_Deposit for custom lighting_

Line Item # from Budget: _62_

Dollar Amount for Request: $ _9,100_

Borrower: _____  Date: _2-11-08_

Borrower: _____  Date: _____

(Advance 2-23-08)



FH-0948

EXHIBIT _M_

'2/23/'08 SAT 01:52   Ultimate   ... 09397859    119257566309    # 3/ 6 !

The person(s) signing this Affidavit is/are personally liable for any loss or damage resulting from any false or incorrect information given on this form.

CONTRACTOR: Ultimate Development, Inc.    BORROWER: Robert & Jennifer Keezler

Name Kevin Javaheri

By: Kevin Javaher

Signature    President

Title

Date: 02/21/08

Signature Robert Keezler    2-21-08
                                Date
Signature Jennifer Keezler    2-21-09
                                Date
                                Q12 r~

### CHANGE ORDER REQUEST
(Must be signed in addition to Draw Request)

Change Order #_____    Total Amount of This Change Order $_____

Description of Changes

$_____

$_____

$_____

$_____

$_____

Above described change orders are approved and accepted by both borrower and builder.

Change order #_____ will be paid from:

_____ Directly from borrower to builder.

_____ *Request use of contingency reserve funds to pay entire Change Order.
(Funds from contingency reserve will be paid based on inspection report
of completed Change Order items, overall completion % of project and funds
remaining in said reserve.)

_____ Other (Describe)_____

_____    _____    _____
Builder Signature            Borrower Signature           Date

_____    _____    _____
Date                         Borrower Signature           Date

FH-0923

EXHIBIT N



EXHIBIT  O



EXHIBIT P

The person(s) signing this Affidavit is/are personally liable for any loss or damage resulting from any false or incorrect information given on this form.

CONTRACTOR: Ultimate Development, Inc.          BORROWER: Robert & Jennifer Keszler

Name  Kevin Javaheri                            Signature    Robert Keszler        8-12-07
                                                                                   Date
By:                                             Signature    Jennifer Keszler      8-12-07
Signature                                                                          Date        K3(34
In:
Title
Date:

CONTRACTOR: Ultimate Development, Inc.          BORROWER: Robert & Jennifer Keszler

Name  Kevin Javaheri                            Signature    Robert Keszler        10-2-07
                                                                                   Date
By:                                             Signature    Jennifer Keszler      10-2-07
Signature                                                                          Date
In:                                                                                Q2
Title
Date:

CONTRACTOR: Ultimate Development, Inc.          BORROWER: Robert & Jennifer Keszler

Name  Kevin Javaheri                            Signature    Robert Keszler        11/13/07
                                                                                   Date
By:                                             Signature    Jennifer Keszler      11/13/07
Signature                                                                          Date
In:                                                                                Q3
Title
Date:

CONTRACTOR: Ultimate Development, Inc.          BORROWER: Robert & Jennifer Keszler

Name  Kevin Javaheri                            Signature    Robert Keszler        1-2-08
                                                                                   Date
By:                                             Signature    Jennifer Keszler      1-2-08
Signature                                                                          Date
In:                                                                                Q6
Title
Date:  01/02/08

CONTRACTOR: Ultimate Development, Inc.          BORROWER: Robert & Jennifer Keszler

Name  Kevin Javaheri                            Signature    Robert Keszler        1-21-08
                                                                                   Date
By:  Kevin Javaheri                             Signature    Jennifer Keszler      1-21-08
Signature                                                                          Date
In:  President                                                                     Q7
Title
Date:  1/21/08

CONTRACTOR: Ultimate Development, Inc.          BORROWER: Robert & Jennifer Keszler

Name  Kevin Javaheri                            Signature    Robert Keszler        2-11-08
                                                                                   Date
By:                                             Signature    Jennifer Keszler      2-11-08
Signature                                                                          Date
In:                                                                                Q8
Title
Date:  2-11-08

CONTRACTOR: Ultimate Development, Inc.          BORROWER: Robert & Jennifer Keszler

Name  Kevin Javaheri                            Signature    Robert Keszler        2-21-08
                                                                                   Date
By:  Kevin Javaheri                             Signature    Jennifer Keszler      2-21-08
Signature                                                                          Date
In:  President                                                                     Q12
Title
Date:  02/21/08

EXHIBIT  Q

 **Designation: E 1658 – 04**

# Standard Terminology for Expressing Conclusions of Forensic Document Examiners[1]

This standard is issued under the fixed designation E 1658; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval

## 1. Scope

1.1 This terminology is intended to assist forensic document examiners in expressing conclusions based on their examination.

1.2 This terminology is based on the report of a committee of the Questioned Document Section of the American Academy of Forensic Science which was adopted as the recommended guidelines in reports and testimony by the Questioned Document Section of the American Academy of Forensic Science and the American Board of Forensic Document Examiners[2,3].

## 2. Referenced Documents

2.1 *ASTM Standards*:[2]
E 444 Guide for Description of Work of Forensic Document Examiners

## 3. Significance and Use

3.1 Document examiners begin their handwriting examinations from a point of complete neutrality. There are an infinite number of gradations of opinion toward an identification or toward an elimination. It is in those cases wherein the opinion is less than definite that careful attention is especially needed in the choice of language used to convey the weight of the evidence.

3.2 Common sense dictates that we must limit the terminology we use in expressing our degrees of confidence in the evidence to terms that are readily understandable to those who use our services (including investigators, attorneys, judges, and jury members), as well as to other document examiners. We must be careful that the expressions we use in separating the gradations of opinions do not become strongly defined "categories" that will always be used as a matter of convenience; instead, these expressions should be guidelines without sharply defined boundaries.

3.3 When a forensic document examiner chooses to use one of the terms defined below, the listener or reader can assume that this is what the examiner intended the term to mean. To avoid the possibility of misinterpretation of a term where the expert is not present to explain the guidelines in this standard, the appropriate definition(s) could be quoted in or appended to reports.

3.4 The examples are given both in the first person and in third person since both methods of reporting are used by document examiners and since both forms meet the main purpose of the standard, *i. e.*, to suggest terminology that is readily understandable. These examples should not be regarded as the only ways to utilize probability statements in reports and testimony. In following any guidelines, the examiner should always bear in mind that sometimes the examination will lead into paths that cannot be anticipated and that no guidelines can cover exactly.

3.5 Although the material that follows deals with handwriting, forensic document examiners may apply this terminology to other examinations within the scope of their work, as described in Guide E 444, and it may be used by forensic examiners in other areas, as appropriate.

3.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 4. Terminology

4.1 *Recommended Terms:*

**identification (definite conclusion of identity)**—this is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatever, and although prohibited from using the word "fact," the examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question.

---

[1] This terminology is under the jurisdiction of ASTM Committee E30 on Forensic Sciences and is the direct responsibility of Subcommittee E30.02 on Questioned Documents

Current edition approved Oct. 1, 2004 Published November 2004. Originally approved in 1995 Last previous edition approved in 1996 as E 1658 – 96

[2] McAlexander. T V., Beck, J, and Dick, R ., "The Standardization of Handwriting Opinion Terminology." *Journal of Forensic Science,* Vol. 36 No. 2, March 1991, pp. 311–319

[3] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International. 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959. United States

EXHIBIT R

 E 1658 – 04

*Examples*—It has been concluded that John Doe wrote the questioned material, or it is my opinion [or conclusion] that John Doe of the known material wrote the questioned material.

**strong probability (highly probable, very probable)**—the evidence is very persuasive, yet some critical feature or quality is missing so that an *identification* is not in order; however, the examiner is virtually certain that the questioned and known writings were written by the same individual.

*Examples*—There is *strong probability* that the John Doe of the known material wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *very probably* wrote the questioned material.

> DISCUSSION—Some examiners doubt the desirability of differentiating between **strong probability** and **probable**, and certainly they may eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

**probable**—the evidence contained in the handwriting points rather strongly toward the questioned and known writings having been written by the same individual; however, it falls short of the" virtually certain" degree of confidence.

*Examples*—It has been concluded that the John Doe of the known material probably wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *probably* wrote the questioned material.

**indications (evidence to suggest)**—a body of writing has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing.

*Examples*—There is evidence which *indicates* (or *suggests*) that the John Doe of the known material may have written the questioned material but the evidence falls far short of that necessary to support a definite conclusion.

> DISCUSSION—This is a very weak opinion, and a report may be misinterpreted to be an identification by some readers if the report simply states, "The evidence *indicates* that the John Doe of the known material wrote the questioned material." There should always be additional limiting words or phrases (such as "may have" or "but the evidence is far from conclusive") when this opinion is reported, to ensure that the reader understands that the opinion is weak. Some examiners doubt the desirability of reporting an opinion this vague, and certainly they cannot be criticized if they eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

**no conclusion (totally inconclusive, indeterminable)**—This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another.

*Examples*—*No conclusion* could be reached as to whether or not the John Doe of the known material wrote the questioned material, or I could not determine whether or not the John Doe of the known material wrote the questioned material.

**indications did not**—this carries the same weight as the

indications term that is, it is a very weak opinion.

*Examples*—There is very little significant evidence present in the comparable portions of the questioned and known writings, but that evidence *suggests* that the John Doe of the known material did not write the questioned material, or I found *indications* that the John Doe of the known material did *not* write the questioned material but the evidence is far from conclusive.

See Discussion after **indications**.

**probably did not**—the evidence points rather strongly against the questioned and known writings having been written by the same individual, but, as in the probable range above, the evidence is not quite up to the "virtually certain" range.

*Examples*—It has been concluded that the John Doe of the known material probably did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material probably did not write the questioned material.

> DISCUSSION—Some examiners prefer to state this opinion: "It is unlikely that the John Doe of the known material wrote the questioned material." There is no strong objection to this, as "unlikely" is merely the Anglo-Saxon equivalent of "improbable".

**strong probability did not**—this carries the same weight as strong probability on the identification side of the scale; that is, the examiner is virtually certain that the questioned and known writings were not written by the same individual.

*Examples*—There is strong probability that the John Doe of the known material did not write the questioned material, or in my opinion (or conclusion or determination) it is highly probable that the John Doe of the known material did not write the questioned material.

> DISCUSSION—Certainly those examiners who choose to use "unlikely" in place of "probably did not" may wish to use "highly unlikely" here.

**elimination**—this, like the *definite conclusion of identity*, is the highest degree of confidence expressed by the document examiner in handwriting comparisons. By using this expression the examiner denotes no doubt in his opinion that the questioned and known writings were not written by the same individual.

*Examples*—It has been concluded that the John Doe of the known material did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material did not write the questioned material.

> DISCUSSION—This is often a very difficult determination to make in handwriting examinations, especially when only requested exemplars are available, and extreme care should be used in arriving at this conclusion.

4.1.1 When the opinion is less than definite, there is usually a necessity for additional comments, consisting of such things as reasons for qualification (if the available evidence allows that determination), suggestions for remedies (if any are known), and any other comments that will shed more light on the report. The report should stand alone with no extra explanations necessary.

 E 1658 – 04

## 4.2 *Deprecated and Discouraged Expressions:*

4.2.1 Several expressions occasionally used by document examiners are troublesome because they may be misinterpreted to imply bias, lack of clarity, or fallaciousness and their use is deprecated. Some of the terms are so blatantly inane (such as "make/no make") that they will not be discussed. The use of others is discouraged because they are incomplete or misused. These expressions include:

**possible/could have**—these terms have no place in expert opinions on handwriting because the examiner's task is to decide to what degree of certainty it can be said that a handwriting sample is by a specific person. If the evidence is so limited or unclear that no definite or qualified opinion can be expressed, then the proper answer is *no conclusion.* To say that the suspect "could have written the material in question" says nothing about probability and is therefore meaningless to the reader or to the court. The examiner should be clear on the different meanings of "possible" and "probable," although they are often used interchangeably in everyday speech.

**consistent with**—there are times when this expression is perfectly appropriate, such as when "evidence consistent with disguise is present" or "evidence consistent with a simulation or tracing is present, but "the known writing is consistent with the questioned writing" has no intelligible meaning.

**could not be identified/cannot identify**—these terms are objectionable not only because they are ambiguous but also because they are biased; they imply that the examiner's task is only to identify the suspect, not to decide whether or not the suspect is the writer. If one of these terms is used, it should always be followed by "or eliminate[d]".

**similarities were noted/differences as well as similarities**—these expressions are meaningless without an explanation as to the extent and significance of the similarities or differences between the known and questioned material. These terms should never be substituted for gradations of opinions.

**cannot be associated/cannot be connected**—these terms are too vague and may be interpreted as reflecting bias as they have no counterpart suggesting that the writer cannot be eliminated either.

**no identification**—this expression could be understood to mean anything from a strong probability that the suspect wrote the questioned writing; to a complete elimination. It is not only confusing but also grammatically incorrect when used informally in sentences such as." I no identified the writer" or "I made a no ident in this case."

**inconclusive**—this is commonly used synonymously with no conclusion when the examiner is at the zero point on the scale of confidence. A potential problem is that some people understand this term to mean something short of definite (or conclusive), that is, any degree of probability, and the examiner should be aware of this ambiguity.

**positive identification**—This phrase is inappropriate because it seems to suggest that some identifications are more positive than others.

**[strong] reason to believe**—there are too many definitions of *believe* and *belief* that lack certitude. It is more appropriate to testify to our conclusion (or determination or expert opinion) than to our belief, so why use that term in a report?

**qualified identification**—An *identification* is not qualified. However, opinions may be qualified when the evidence falls short of an *identification* or *elimination.*

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax). or service@astm.org (e-mail); or through the ASTM website (www.astm.org).*