1  CARL P. BLAINE (State Bar No. 65229)
   cblaine@wkblaw.com
2  ERIC R. GARNER (State Bar No. 131232)
   egarner@wkblaw.com
3  **WAGNER KIRKMAN BLAINE**
   **KLOMPARENS & YOUMANS LLP**
4  10640 Mather Blvd., Suite 200
   Mather, California 95655
5  Telephone:  (916) 920-5286
   Facsimile:  (916) 920-8608
6
   Attorneys for Plaintiffs
7  ROBERT KESZLER AND
   JENNIFER CUTTS KESZLER
8

9              **UNITED STATES DISTRICT COURT**
               **EASTERN DISTRICT OF CALIFORNIA**
10                **SACRAMENTO DIVISION**

11

12 JENNIFER CUTTS KESZLER, ET AL.,          Case No.:  2:08-CV-02359-LKK-KJM

13          Plaintiff,                        **EXPERT WITNESS REPORT OF**
                                              **JOHN H. MOULTON**
14      v.
                                             Trial Date:  June 15, 2010
15 FIRST HORIZON HOME LOANS, ET AL.,

16          Defendants.

17

18      Pursuant to the Federal Rules of Civil Procedure 26 (A)(2)(b), JENNIFER KESZLER

19 and ROBERT KESZLER hereby submit the Expert Witness Report of John H. Moulton,

20 attached hereto as Exhibit 1.

21 DATED:  September 4, 2009            WAGNER KIRKMAN BLAINE
                                        KLOMPARENS & YOUMANS LLP
22

23
                                        By: _____Carl P. Blaine_____
24                                           CARL P. BLAINE
                                             Attorneys for
25                                           JENNIFER KESZLER
                                             ROBERT KESZLER
26

27

28

EXHIBIT 1

OPINION OF

JOHN H. MOULTON

IN

KESZLER v. FIRST HORIZON BANK

AUGUST 31, 2009

OPINION OF

JOHN H. MOULTON

IN

KESZLER v. FIRST HORIZON BANK

DESCRIPTION OF THE TRANSACTION

In July, 2007 Dr. Robert Keszler and Ms. Jennifer Cutts Keszler obtained a
$1,500,000.00 construction/permanent loan to fund the construction of a single family
residence that was to be their home at 4873 Moreau Court, El Dorado Hills, California.
The loan was documented and processed by First Horizon Bank's Construction Loan
Department in Walnut Creek, California.

SUMMARY OF OPINIONS

First Horizon Bank failed to adhere to both their procedures and the standard of care in
California when processing the Keszler's loan on 4873 Moreau Court, El Dorado Hills,
California.

1. Lack of written and auditable policies for processing construction draws.

2. Failing to have policy and procedure manuals for processing
   progress/construction draw requests in the Walnut Creek Office.

3. First Horizon Bank failed to adhere to the terms of its documentation.

a. Failing to obtain lien releases with each draw as required by the Bank's own documentation.

b. Failing to withhold retention on each construction draw.

c. Failing to review each construction draw that was faxed by the contractor to verify that each Draw Request/Direct Disbursement/Interim All Bill's Paid Affidavit bore an original signature of all signatories to that draw.

4. Failing to have Loan Approval/Progress Payment Control Check-off Sheets for progress and supervisory review.

5. Vicki Kirwald, the Loan Disbursement Analyst that processed most of the progress draws for the Keszler loan failed to review the requirements of the loan documents.

## MY QUALIFICATIONS

I have been involved with bank lending for the past forty-seven years. Initially with Bank of America in San Diego, I became involved with installment lending. For six years I worked with direct loans to bank customers in addition to buying loans from and lending to auto dealers, boat dealers and appliance dealers.

In 1968, I joined Bank of California as an installment lender and was soon promoted to real estate lending. After attending a training program, I worked with both the residential and construction lending departments of the San Diego Office. Many of my customers required commercial loans and I worked closely with the Senior Credit Officer of the branch on such credits.

In 1972, I was promoted to the Metropolitan Division of the Corporate Banking Group at The Bank of California's Headquarters in San Francisco, California. I managed and expanded a portfolio of major business customers, both private and public entities. My charge was to manage their domestic lending requirements and coordinate all deposit,

trust, international and general banking needs. My responsibilities included managing, evaluating and/or consulting on various types of financing including lines of credit, construction loans, mortgage warehouse lines and term loans. I managed a number of inter-bank loan participations for my larger clients.

In 1977, I was recruited to Hibernia Bank, in San Francisco, California, where I headed the Real Estate Lending Group. In my eight years at Hibernia, the portfolio of the department grew from $300,000,000.00 to over $2,000,000,000.00. I established a construction lending group, mortgage banking function, mortgage servicing department and a commercial lending to real estate customers group.

Following Hibernia, I was recruited to the Presidency of Tri-Valley National Bank in Dublin, California. Tri-Valley's previous management had depleted the Bank's capital with risky lending practices and income recognition strategies that caused the National Bank Examiners to place a Cease and Desist Order on the bank. After recapitalizing the institution, I worked to restructure the Bank's policies and procedures, rebuild the customer base and return the bank to profitability. In less than a year the Cease and Desist Order was removed.

Following Tri-Valley National Bank I was recruited by a former customer, Embarcadero Mortgage. Though I managed Embarcadero's loan brokerage and financial functions, my true function was to advise the owners on the feasibility of converting to or merging into a bank or thrift. After a few months it was my advice they remain just as they were and I left to establish Moulton Advisors.

As Moulton Advisors, I consult to troubled borrowers on restructuring their lending and/or banking relationships, analyze loan portfolios, perform credit/risk loan grading studies, work with government agencies on lending issues, and serve as a consultant or expert witness on banking issues. I have served as both a Receiver and project manager to Receivers on a variety of debt-related receiverships.

## COMPENSATION

I have been retained in this matter by Wagner, Kirkman, Blaine, Klomperens & Youmans, LLP to review documents, read depositions, and present my opinions in the matter of Keszler v. First Horizon Bank. I charge $300.00 per hour for all services performed in this matter.

## BASIS FOR OPINIONS

First Horizon Bank failed to adhere to both their procedures and the standard of care in California when processing the Keszler's loan on 4873 Moreau Court, El Dorado Hills, California.

1. Lack of written and auditable policies for processing construction draws. It is basic to banking and, in fact, a Federal law (12CFR365.2) (Exhibit A) that banks have and maintain written procedures approved by the bank's Board of Directors not only for lending policies but for loan administration procedures as well. The Comptroller of the Currency's Real Estate and Construction Lending Handbook page 10 (Exhibit B) states "Examiners should determine whether the bank is monitoring overall compliance with its real estate lending policy."

2. Failing to have policy and procedure manuals for processing progress/construction draw requests in the Walnut Creek Office. Based on deposition testimony of Holly Grieser (the Bank's former Loan Administration Manger for seven years) stated on page 15, "We had internal cheat sheets, if you will that kind of thing, but no formal manuals, if you will." Clearly "cheat sheets" do not meet either the Federal Law or the spirit of the Comptroller's hand book. On page 35 of Ms. Grieser's deposition when asked about a three ring binder of written policies she responded "The only thing that we really had was our manual for our computer system, ICL." In Vicki Kirwald's deposition on pages 49 through 52 Ms. Kirwald describes a thick, two inch three ring binder department manual in a general cubicle and she did not recall

the name of the manual. On page 52 when asked can you recall any one specific time that you referred to the manual, her answer was "No."

3. First Horizon Bank failed to adhere to the terms of its documentation.

    a. Failing to obtain lien releases with each draw as required by the Bank's own documentation. A requirement stated in First Horizon's August 8, 2007 "builder" letter (FH – 1194 – 1207) to Kevin Javaberi, Ultimate Development, Inc. was that a Conditional Lien Release must accompany each draw. I found one "Conditional Waiver and Release on Progress Payment" dated August 9, 2007. It is basic lending and the First Horizon Bank's funding condition that a lien release accompanies each draw. Every Draw released to Ultimate Development without a lien release was a violation of First Horizon's loan documentation and should not have been funded.

    b. Failing to withhold retention on each construction draw. First Horizon Bank's Retention requirement was up to 10% in the Bank's Retainage Agreement (FH16D13D) which was modified to 5% based on the Construction contract between the Keszler's and Ultimate Construction. Despite the 5% retention requirement First Horizon failed on each and every draw to withhold any retention. This defeats the concept of holding retention. It is basic to construction/contractor finance that a portion of each draw is withheld to insure the contractor completes the project in a workman like lien free manner. The Comptroller's Handbook, on page 17 (Exhibit C) of the Real Estate and Construction Lending states "The bank normally retains or holds back, 10 to 20 percent of each payment to cover cost overruns or outstanding bills from suppliers or subcontractors."

    c. Failing to review each construction draw that was faxed by the contractor to verify that each Draw Request/Direct Disbursement/Interim All Bill's Paid Affidavit bore an original signature of all signatories to that draw. When documents are presented by the facsimile process as opposed to a "wet" signature it is basic to verify that all signatures are genuine and original to

the document. This can be done by comparing signatures to prior documents and/or contacting the signatory. In this case a comparison of page two of the Affidavits dated October 2, 2007 with ones dated November 13, 2007, January 2, 2008, January 21, 2008, February 11, 2008 and February 21, 2008 would have disclosed signatures and documents were so similar, in fact, identical except for their dates, as to raise a question as to their validity that would require an investigation by the Loan Disbursement Analyst.

4. Failing to have Loan Approval/Progress Payment Control Check-off Sheets, a standard control device, to measure progress and support any supervisory review. One of the simplest and most efficient methods of assuring accurate and complete documentation of both loan and draw funding approvals is to use a form that requires a manual check-off and personal initial of the person performing each and every required action or approval of each requirement necessary prior to each funding. This form is a reminder of each task that must be completed, each approval that must be obtained and an audit aid to see who performed the action and when. I did not find such a sheet in the documents I reviewed in this matter.

5. Vicki Kirwald the Loan Disbursement Analyst that processed most of the progress draws for the Keszler loan failed to review the requirements of the Keszler loan documents.

   a. When asked on page 40 of her deposition if she, Ms. Kilwald, personally reviewed the Residential Construction Loan Agreement (FH-0470 through FH- 0478) for the Keszler loan, she said "No."

   b. When asked on page 41 if the Retainage Agreement (FH-0515) looked familiar in the context of her work at First Horizon and the Keszler loan, she said, "No."

   c. On page 42 of her deposition Ms. Kirwald answered "No, what does it mean," To the question "Am I correct in saying that you - do you have a

concept as to what retainer or retainage is in the context of a loan disbursement?"

   d. When asked if she had seen the form "Borrowers Consent to Advance to Contractor' form (FH-0489) on page 43 she responded, "Not specifically, no."

   e. On pages 43 and 44 Ms. Kirwald was asked if she had seen the "Draw Procedures" form. Her answer was" No."

   f. On pages 49 through 52 of her deposition Ms. Kirwald describes a thick, two inch three ring binder department manual in a general cubicle that she did not recall the title of the manual. On page 52 when asked if she ever referred to the manual her answer was, "No." On page 52 when asked "can you recall any one specific time that you referred to the manual?" her answer was "No."


DEPOSITION TESTIMONY BY JOHN H. MOULTON IN THE LAST FOUR YEARS

2004

Los Angeles, California

August 27, 2004 McIntyre and Larson v Santa Monica Bank, For Plaintiff, Checking account management, John Carpenter, Esq. Carpenter & Zuckerman


2005

San Francisco, California

April 11, 2005 Gurson v Wells Fargo Bank, For Defendant Wells Fargo Bank, Mortgage lending, Attorney Juan Carlos Araneda, Esq. Long & Levit


2006

Visalia, California

October 30, 2006 West Visalia Grange v. Buhl, For Plaintiff, embezzlement, Thomas Nickens, The Law Offices of Thomas Nickens

San Jose, California

March 15, 2006 Neumann v. Friedland et al., For Defendant, Mortgage lending and credit scores, Margaret M. Schneck, Esq., Robinson & Wood

Palo Alto, California

September 1, 2006 Gamini v. Gamini For Defendant, Mortgage lending, Elizabeth Zareh, Esq., Zareh & Associates

San Francisco, California

October 16, 2006 Lee v Bank of America et al., For Plaintiff, Deposit accounts, James Cai, Esq., Schein & Cai

2007

San Francisco, California

October 17, 2007 Parker v. McCaw, For Defendant, Lending and loan underwriting, David Millstein, Esq., Millstein & Associates

2008

San Francisco, California

February 8, 2008 Guide v. Reserve Financial Inc., For Plaintiffs, Mortgage banking, Michael Goforth, Esq., Goforth and Lucas

Anchorage, Alaska telephonically from Walnut Creek, California

April 24, 2008 Wedel v. Northrim Bank, For Plaintiff, Unfair advantage, Don C. Baurmeister, Esq., Burke and Baurmeister

Oakland, California

July 11, 2008 Kachur v. Garvish, For Plaintiff, Construction lending, Christopher R. Lucas, Esq., Goforth & Lucas

Salt Lake City, Utah

August 5, 2008 API v. Key Bank (Camco Construct Inc. v. Utah Baseball Academy)

For Defendant, Construction lending and loan workout, R. Stephen Marshall, Esq. and Steven J. McCardell, Esq., for Durham, Jones & Pinegar

Los Angeles, California
September 26, 2008 IndyMac v. Angelino Mortgage, For Defendant, Mortgage banking, Jonathon Feldhiem, Esq. for Carlson Law Group

2009
San Ramon, California
March 5, 2009 Kidd v. Creative Loans, For Plaintiff, Mortgage Banking
Thomas Mathew, Esq. for Farella, Braun & Martel

Los Angeles, California
July 29, 2009 Marcus v. Prudential, For Defendant, Credit Damage
David Marmorstein, Esq. for Freedman & Taitelman

## TRIAL TESTIMONY BY JOHN H. MOULTON IN THE LAST FOUR YEARS

2005
October 6, 2005, United States v. John Hickey, for Plaintiff, Hon. Thomas Alsop, Federal District Court San Francisco, California, Real Estate Development

2006
February 21, 2006, West Visalia Grange v. Buhl, for Plaintiff, Hon. Paul Vorsman, Superior Court of California, County of Tulare, Deposit embezzlement

2007
February 8, 2007, Altamira v. Candela, for Defendant, Hon. Jonathan Karesh, Superior Court of California, County of San Mateo, Real estate fraud

2008

May 27, 2008, Robinson v. Roberts, for Plaintiff, Hon. Cecilla Castellanos, Superior Court of California, County of Alameda, Deposit fraud

July 10, 2008, Wedel v. Northrim Bank, for Plaintiff, Hon. Jack A. Smith, Superior Court of Alaska, Anchorage Alaska, Unfair advantage

INFORMATION REVIEWED and/or CONSIDERED

Complaint in Keszler v. First Horizon Bank, et. al El Dorado County Superior Court Case PC20080549

Residential Construction Loan Agreement for the Keszler loan executed July 27, 2007 and its Rider (FH – 0470 – 0483)

First Horizon Bank's Draw Procedures (FH – 0115)

First Horizon Bank's August 8, 2007 Builder Draw Letter and supporting exhibits (FH – 1194 – 1207)

First Horizon Bank's August 8, 2007 Borrower Draw Information letter (FH – 1192-1193)

First Horizon Bank's Retainage Agreement signed by the Keszlers and Ultimate Development, Inc. but undated (FH – 0515)

The July 26, 2007 Borrower Request to modify Retention from 10% to 5% dated July 26, 2007 (FH – 0432)

Contractor/Builder Disclosure dated July 26, 2007 signed by the Keszlers (FH – 0491)

Borrower's Consent To Advance Funds To Contactor dated July 27, 2007 signed by the Keszlers (FH – 0489)

Indemnity dated July 27, 2007 signed by Ultimate Development and the Keszlers (FH – 0433)

Owner Contractor Agreement and exhibits signed on May 22, 2007 by Ultimate Development, Inc. and on May 23, 2007 by the Keszlers (FH – 0635 – 0656)

The DELTA CPM, INC.'S ANALYSIS OF DOCUMENTS on the KESZLER RESIDENCE and all documents contained there in.

DDN Draw Inspection Reports 1 thru 10

California Department of Consumer Affairs - Contractors State License Board "UNCONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT" form

The June 16, 2009 Deposition of HOLLY GRIESER

The June 17, 2009 Deposition of VICKI KIRWALD

My forty-seven years of lending experience

LIST OF ALL PUBLICATIONS AUTHORED IN LAST TEN YEARS

An article for The December 2007 Consolidated Consultants newsletter entitled "The Expert Witness and the Sub Prime Crisis."

## CONCLUSION

First Horizon Bank's progress funding procedures for the Keszler loan were flawed
which contributed to the over funding issues described in the Delta CPM, Inc. Analysis of
Documents on the Keszler Residence.

_____  8-31-09
John H. Moulton                                    date

EXHIBIT A

[Code of Federal Regulations]
[Title 12, Volume 4]
[Revised as of January 1, 2006]
From the U.S. Government Printing Office via GPO Access
[CITE: 12CFR365.2]

[Page 482-486]

TITLE 12--BANKS AND BANKING

CHAPTER III--FEDERAL DEPOSIT INSURANCE CORPORATION

PART 365_REAL ESTATE LENDING STANDARDS--Table of Contents

Sec. 365.2 Real estate lending standards.

(a) Each insured state nonmember bank shall adopt and maintain
written policies that establish appropriate limits and standards for
extensions of credit that are secured by liens on or interests in real
estate, or that are made for the purpose of financing permanent
improvements to real estate.
(b)(1) Real estate lending policies adopted pursuant to this
section
must:
(i) Be consistent with safe and sound banking practices;
(ii) Be appropriate to the size of the institution and the nature
and scope of its operations; and
(iii) Be reviewed and approved by the bank's board of directors at
least annually.
(2) The lending policies must establish:
(i) Loan portfolio diversification standards;
(ii) Prudent underwriting standards, including loan-to-value
limits,
that are clear and measurable;
(iii) Loan administration procedures for the bank's real estate
portfolio; and
(iv) Documentation, approval, and reporting requirements to monitor
compliance with the bank's real estate lending policies.
(c) Each insured state nonmember bank must monitor conditions in
the
real estate market in its lending area to ensure that its real estate
lending policies continue to be appropriate for current market
conditions.
(d) The real estate lending policies adopted pursuant to this
section should reflect consideration of the Interagency Guidelines for
Real Estate Lending Policies established by the Federal bank and thrift
supervisory agencies.

# EXHIBIT A

7. Loans for which a lien on or interest in real property is taken as additional collateral through an abundance of caution by the lender (e.g., the bank takes a blanket lien on all or substantially all of the assets of the borrower, and the value of the real property is low relative to the aggregate value of all other collateral).

8. Loans, such as working capital loans, where the lender does not rely principally on real estate as security and the extension of credit is not used to acquire, develop, or construct permanent improvements on real property

9. Loans for the purpose of financing permanent improvements to real property, but not secured by the property, if such security interest is not required by prudent underwriting practice.

## Exceptions to the General Lending Policy

The lending policy should include mechanisms for considering loan requests from creditworthy borrowers whose needs fall outside the limits of the general lending policy. Requests for such exception loans should be reviewed and approved at an appropriate level within the bank. The underwriting decision should be supported by a written justification that clearly sets forth all of the relevant credit factors considered. Exception loans of a significant size should be individually reported to the board of directors.

## Supervisory Review of Real Estate Lending Policies and Practices

Examiners should determine whether a bank's real estate lending policies and practices are consistent with safe and sound banking practice, satisfy the requirements of Subpart D of 12 CFR 34, and reflect an appropriate consideration of the interagency guidelines. When evaluating the adequacy of real estate lending policies and practices, examiners should consider:

- The nature and scope of the bank's real estate lending activities.
- The size and financial condition of the bank.
- The quality of management and internal controls.
- The expertise and size of the lending and loan administration staff.
- Market conditions.

Examiners should determine whether the bank is monitoring overall compliance with its real estate lending policy. Examiners also should review lending policy exception reports to determine whether exceptions to loan policy are adequately documented and appropriate in light of all of the relevant credit considerations. An excessive number of exceptions to the real estate lending policy may indicate that the bank is unduly relaxing its underwriting practices or it may suggest that the bank needs to revise its loan policy

## Appraisal and Evaluation Programs

As is true of all lending activities, a bank's primary concern should be that its real estate loans are made with a reasonable probability that the borrower will have sufficient cash flow to meet the repayment terms. However, the value of the collateral is a significant factor affecting the risk in real estate lending, so it also is essential for the bank to have adequate appraisal and evaluation programs.

Appraisals are professional judgments of the market value of real property. Professional appraisers use three approaches to estimate the market value of property the cost approach, the market data or direct sales approach, and the income approach. (See Attachment 2 of Appendix A for a more detailed discussion of these three approaches.)

Failure to have an appraisal and evaluation program that provides an independent and objective valuation of real estate

EXHIBIT B

15 of 16

EXHIBIT C

updated lien search and title insurance whenever construction funds are disbursed

## Standard Payment Plan

A standard payment plan is normally used for residential and smaller commercial construction loans. Because residential housing projects usually consist of houses in various stages of construction, this plan uses a pre-established schedule for fixed payments at the end of each specified stage of construction

A standard payment plan most commonly consists of five equal installments. The first four disbursements are made when construction has reached agreed-upon-stages, verified by actual inspection of the property The final payment is made only after the legally stipulated period for mechanics' liens has expired.

Most banks require five-payment disbursement plans for each house constructed within a tract development. As each house is completed and sold, the bank modifies its master deed of trust by releasing liability for that particular house. Except in some workout situations, excess net sales proceeds are remitted to the borrower.

## Progress Payment Plan

The progress payment plan is normally used for commercial projects. Under a progress payment plan, the bank releases funds as the borrower completes certain phases of construction. The bank normally retains, or holds back, 10 percent to 20 percent of each payment to cover project cost overruns or outstanding bills from suppliers or subcontractors.

Under a progress payment plan, the borrower requests payment from the bank in the form of a "construction draw" request or "certification of payment," which sets forth the funding request by construction phase and cost category. The borrower also certifies that the conditions of the loan agreement have been met, e.g., that all requested funds are being used for the project, and that suppliers and subcontractors are being paid. The construction draw request should include waivers from the project's subcontractors and suppliers indicating that payment has been received for the work completed. After reviewing the draw request and independently confirming the progress of work, the bank then disburses funds for construction costs incurred, less the holdback.

### Final Disbursement

The final draw on a commercial construction loan usually includes payment of the holdback as stipulated in the loan agreement. The draw is used by the borrower to pay all remaining bills. Before releasing the final draw and disbursing the holdback, a bank should confirm that the borrower has obtained all waivers of liens or releases from the project's contractors, subcontractors, and suppliers. The bank also should obtain and review the final inspection report to confirm that the project is completed and meets the building specifications. The bank also should confirm that the builder has obtained a certificate of occupancy from the governing building authority.

In addition, final disbursement should not occur until the bank is assured that the construction loan can be converted to a permanent loan. For loans without a take-out commitment, the bank should satisfy itself that all conditions typically imposed by permanent lenders for that type of project have been met. If the project has a pre-committed take-out lender, the construction lender should be sure that the construction loan documents are in order so that the permanent lender can assume the security interest in the project.

A take-out or permanent lender sometimes pays off only a portion of the construction loan because the conditional requirement for the borrower to obtain full funding has not been met. One example of a conditional requirement would be that the project attain a certain level of occupancy. Before the required level of occupancy is attained, the construction lender is subordinated to the take-out lender for the remaining balance of the construction loan. After occupancy levels

---

EXHIBIT C