CARL P. BLAINE (State Bar No. 65229)
cblaine@wkblaw.com
ERIC R. GARNER (State Bar No. 131232)
egarner@wkblaw.com
**WAGNER KIRKMAN BLAINE
KLOMPARENS & YOUMANS LLP**
10640 Mather Blvd., Suite 200
Mather, California 95655
Telephone: (916) 920-5286
Facsimile: (916) 920-8608

Attorneys for Plaintiffs
ROBERT KESZLER AND
JENNIFER CUTTS KESZLER

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA
# SACRAMENTO DIVISION

| | |
|---|---|
| JENNIFER CUTTS KESZLER, ET AL., | Case No.: 2:08-CV-02359-LKK-KJM |
| Plaintiff, | **EXPERT WITNESS REPORT OF MARK B. BERRY** |
| v. | Trial Date: June 15, 2010 |
| FIRST HORIZON HOME LOANS, ET AL., | |
| Defendants. | |

Pursuant to the Federal Rules of Civil Procedure 26 (A)(2)(b), JENNIFER KESZLER and ROBERT KESZLER hereby submit the Expert Witness Report of Mark B. Berry, attached hereto as Exhibit 1.

DATED: September 4, 2009
              WAGNER KIRKMAN BLAINE
              KLOMPARENS & YOUMANS LLP


              By:   Carl P. Blaine
                 CARL P. BLAINE
                 Attorneys for
                 JENNIFER KESZLER
                 ROBERT KESZLER

EXHIBIT 1

# EXPERT REPORT
## OF
## MARK B. BERRY

## ON THE

## KESZLER RESIDENCE
## EL DORADO HILLS, CALIFORNIA

Dated: September 2, 2009

# TABLE OF CONTENTS

PART I: REPORT ORGANIZATION ........................................................................... 1

I.  ORGANIZATION .................................................................................................. 1
    A.  THIS EXPERT REPORT IS ORGANIZED INTO 5 PARTS ..................... 1
    B.  ABBREVIATIONS USED IN THIS REPORT ............................................ 2

PART II: SUPPORTING DOCUMENTS, SOURCES OF INFORMATION AND
    CATALOGUED MATERIAL ............................................................................. 2

II. SUPPORTING DOCUMENTS, SOURCES OF INFORMATION AND
    CATALOGUED MATERIALS ............................................................................. 2
    A.  DOCUMENTS INCLUDED IN THIS REPORT ........................................ 2
    B.  RECORDS CONSIDERED BUT NOT INCLUDED WITH THE
        DOCUMENTS PROVIDED WITH THIS REPORT .................................. 3
    C.  INTERVIEWS AND DISCUSSIONS ......................................................... 4
    D.  DELTA CPM, INC. PERSONNEL ............................................................. 4
    E.  DEPOSITIONS .......................................................................................... 4
    F.  TREATISES AND REFERENCES ............................................................ 4

PART III: METHODOLOGY ....................................................................................... 5

III. METHODOLOGY .................................................................................................. 5
    A.  PROCESS OF FACTUAL ASSESSMENT ............................................... 5
    B.  REVIEW OF PROJECT RECORD ........................................................... 6

PART IV: EXPERT'S QUALIFICATIONS .................................................................. 7

IV. EXPERT'S QUALIFICATIONS ............................................................................ 7
    A.  EXPERT'S RESUME ................................................................................. 7
    B.  PUBLICATIONS ......................................................................................... 7
    C.  EXPERT'S RATE ....................................................................................... 7
    D.  PRIOR TESTIMONY .................................................................................. 7

PART V: EXPERT'S OPINIONS ................................................................................ 8

V.  EXPERT'S OPINIONS ......................................................................................... 8

EXPERT REPORT
OF
MARK B. BERRY


ON THE


KESZLER RESIDENCE
EL DORADO HILLS, CALIFORNIA

This Report contains my Expert Opinions and the support for these opinions

*[signature]*
Mark B. Berry
September 2, 2009


PART I: REPORT ORGANIZATION


I.  ORGANIZATION


A.  THIS EXPERT REPORT IS ORGANIZED INTO 5 PARTS

   1.  PART I: REPORT ORGANIZATION

   2.  PART II: SUPPORTING DOCUMENTS, SOURCES OF INFORMATION AND CATALOGUED MATERIAL

   3.  PART III: METHODOLOGY

   4.  PART IV: EXPERT'S QUALIFICATIONS

   5.  PART V: EXPERT'S OPINIONS

## B. ABBREVIATIONS USED IN THIS REPORT

The individuals and companies involved in the project or my assembling of data on this project are the following:

> Robert and Jennifer Keszler [Home Owners/Borrowers] (Keszlers)
> Wagner, Kirkman and Laine, et al., David Scharlach, Esq. [Attorney] (Scharlach)
>
> Ultimate Development, Inc.[Contractor] (UDI)
> > Owned by Mr. Kevin Javaheri
>
> First Horizon Construction Lending [Bank] (Bank or Lender)
> > Lorrie Simms [Construction Draw Specialist] (Simms)
> > Vicky A. Kirwald [Bank Loan Disbursement Analyst] (Kirwlad)
> > Holly Grieser [Bank Loan Administrator] (Grieser)

## PART II: SUPPORTING DOCUMENTS, SOURCES OF INFORMATION AND CATALOGUED MATERIAL

## II. SUPPORTING DOCUMENTS, SOURCES OF INFORMATION AND CATALOGUED MATERIALS

Many sources of information were considered in developing the opinions expressed in this Report. Documents reviewed include those in the files of Keszler, Bank and Contractor which were produced to the office of Mr. Scharlach.

I have reviewed the documents produced and they are listed below.

## A. DOCUMENTS INCLUDED IN THIS REPORT

In the process of reviewing the project records certain documents were selected and organized in the analysis of documents binder which are included in the production of this Report. The documents that are included with this Report are organized as follows:

1. Expert Report
2. Analysis of Documents Binder
3. Summary of Draws (Tab 1)
4. Blomberg Window Systems lien documents

## B. RECORDS CONSIDERED BUT NOT INCLUDED WITH THE DOCUMENTS PROVIDED WITH THIS REPORT

Some of the documents reviewed and considered in the preparation of this Report were copied and organized, placed in boxes and maintained in the offices of Delta CPM in Sacramento, California. These documents are available for review and include the following:

    2 boxes of documents consisting of:
    1 binder "Cost Breakdown Detail Excluding Pending Draws Reports";
    1 binder "Liens and Preliens from Subs";
    2 binders "Contract Draws";
    1 binder "Kessler Copy #1"
        Correspondences with DA and Attorney
        Lien
        Insurance
        Underwriting Process
        Loan Documents
    1 binder "Kessler Copy #2"
        Construction Contract and Addendum General Specs
        Draw Procedures
        Draws (Chronologically)
    1 binder "Documents";
        1. Owner/Contractor Agreement and General Specifications
        2. Accounting to date 4/28/08
        3. Draws
        4. Bank Documents (Wire Transfer, Documentation Detail, and Advance Approval)
        5. Article on Developer and Contractor License Status and Claims
       Client Documents
        6. Client Correspondence
        7. Owner/Contractor Agreement, General Specifications and Cost Breakdown
        8. Contractors License Status and Claims
        9. Ultimate Correspondence
        10. Vendor List
        11. Bank E-mail, Invoice, Receipts
        12. Ultimate Invoices, Work Orders and Payments
        13. Ultimate Contracts and General Specifications, E-mails and Cost Breakdowns
        14. Liens and Preliens
        15. Baker Construction Invoices
        16. Cornerstone Plaster Invoices
        17. Golden State Invoices
        18. Mountain Built-In Systems Proposal/Contract

Delta CPM, Inc.    Wagner Kirkman Blaine Klomparens & Youmans, LLP (David Scharlach, Esq )
September 2, 2009    Keszler Residence
WKI 1024    Page 3

19. Pro Painting Invoices
20. Valley Construction E-mail and Invoices
21. Waterworks e-mail, ship manifests and tracking
22. Draw Inspection Results # 1 through #10

## C. INTERVIEWS AND DISCUSSIONS

During the course of my investigation I interviewed and had discussions with the following people:

Mr. David Scharlach, Esq.

## D. DELTA CPM, INC. PERSONNEL

The following Delta CPM personnel assisted me in preparing this Report;

1. Judy Swanson, Construction Document Technician
2. Denise Graziani, Administrative
3. Scott Borrow, Delta CPM Consultant, Contractor and Home Builder

## E. DEPOSITIONS

The following depositions were reviewed:

1. Vicky A. Kirwald (Bank Loan Disbursement Analyst)
2. Holly Grieser (Bank Loan Administrator)
3. Robert Keszler (excerpts discussing invoices)

## F. TREATISES AND REFERENCES

In support of opinions expressed in this Report, text books and reference material were consulted. These are also the text book I use in my course. The following are the texts:

1. James Acret, California Construction Law Manual, Sixth Edition, Thomson - West, 2005
2. William D. Locher, Acret California Construction Law Manual, Contractor's Edition, BNI Publications, Inc., 2008

# PART III: METHODOLOGY

## III. METHODOLOGY

### A. PROCESS OF FACTUAL ASSESSMENT

My first contact on this project was from the offices of Mr. Scharlach on December 16, 2008. I went to the offices of Mr. Scharlach to gather information and investigate the situation.

At the office I spoke with Mr. Scharlach and listened to his client's perspectives of events occurring on the job. We discussed the building and loan contracts, the contractor's performance, events on the job, job status, and the Bank payment processes.

I then reviewed the documents provided to me.

I reviewed the documents and files to evaluate the process of managing project documentation and to understand what documents were available.

Mr. Scharlach's personnel provided documentation. I reviewed and checked this information. I used this information to determine the amounts, retention, dates and durations of pay requests, amounts improperly paid and the consequences on the Kezsler's.

Identifying a schedule of values represented the agreed value of work to be performed and its allocation for contract payment purposes.

I reviewed the job records and the process undertaken to track and monitor job progress and payments. Next I identified issues and events that differed form typical construction progress payments process and the approach represented in the contracts.

In determining the causes of the damages to the Keszler's efforts were made to determine job progress, payments, proper monthly retention, conditional and unconditional releases from the contractor, subcontractors and suppliers, and the payments issued from the Bank.

After identifying project payment requests, my next task was to identify the proper payment documentation in the form of progress billings, retention, Owner authorizations, and the conditional and unconditional releases. To perform this evaluation I identified preliminary lien notices and the parties who provided them. I underwent a process to check invoices with preliminary lien releases and the proper

lien releases.

It became evident to me that the reasonable and customary owner's expectations for construction performance and industry practice for construction payment management had not been achieved. From the documents reviewed, the Bank's payment process fell below the standard of care in the industry and directly caused damages to the Keszler's.

My evaluation methodology included, identifying the scope and approach to the work and payments for the work performed, evaluating the actual approach to the job and payments, and determining the cost consequences of below standard approach to progress payments.

## B. REVIEW OF PROJECT RECORDS

I reviewed, selected and organized the information and materials obtained through discovery. I reviewed this information in conjunction with the Keszler's project records. I also had further conversations with Mr. Scharlach. I evaluated the information for each pay period over the evolution of the project, and concluded that the normal project systems of payment safeguards was abandoned by the Bank. My findings are organized in this report.

The industry payment procedure safeguards in the contracts and standard practice were not followed by the Bank and/or Contractor. The major safeguard for the Owner, proper releases, was missing.

As part of my Report, I prepared a binder entitled "Analysis of Documents", and given to opposing council in its entirety. The analysis is my review and opinions on the work billed for and the invoices for that work.

From my Analysis the below standard of care of the industry payment procedures are evident and it is clear that they are not the responsibility of the Keszlers.

My findings and opinions were then organized. This Report and accompanying documents and Binders demonstrates the cause of the monetary loss to the Keszlers.

The Damages part of this Report calculates the damages that were the direct result of the actions and omissions by the Bank.

Although efforts have been made to discuss each issue as it arises, identify my opinion associated with it, and provide the factual basis supporting the opinion, this Report must be read as a whole because the issues overlap and are intertwined.

# PART IV: EXPERT'S QUALIFICATIONS

## IV. EXPERT'S QUALIFICATIONS

### A. EXPERT'S RESUME

I have been President of Delta Construction Project Management, Inc. (Delta CPM) since 1988. The company specializes in providing project management consulting services on problem projects. Our work involves scheduling, progress evaluation and payment procedures, contract management consulting and expert witness services. Delta CPM has provided scheduling and contract management services on approximately 1,000 projects in 21 years of business.

I am also an instructor at the University of California, Davis, Construction Management Extension program. The student group consists of college students, trades people, company management personnel, attorneys, owners of companies and public works personnel. For several years I have taught courses on managing projects, change orders and claims and construction law. Course topics covered include rights and responsibilities or parties involved in a construction project, schedule analysis, payment and payment procedures.

### B. PUBLICATIONS

I have attached my resume. **(Tab 2)**

I have authored course material for my course entitled "Managing Public Works Projects". The Binder of material is available for copying.

### C. EXPERT'S RATE

My expert rate is $350.00 per hour.

### D. PRIOR TESTIMONY

The depositions and testimony I have given in the past four years are provided. **(Tab 3)**

# PART V: EXPERT'S OPINIONS

## V. EXPERT'S OPINIONS

The contract between the Bank and Keszlers called for releases before payment could be made but this was not done.

The standard of care for each of the Progress Payments and the Final Payment required a Conditional Lien Release and an Unconditional Lien Release from the contractor and all subcontractors and vendors who provided a Preliminary Lien Release (20 Day Notice, something referred to as a "Prelien").

The Lender did not even require the standard release forms of the contractor, subcontractors and vendors for each payment despite having received the preliminary lien release forms from subcontractors and suppliers.

The borrower, Keszlers, would have been protected from double payments by following the standard payment procedures.

The lien releases did not follow the statutory language of the California Civil Code. The lien release used by the lender where not the standard required in California by the Civil Code which is the standard of practice for the industry. The Lender therefore fell below the standard of care in California.

The Bank made payments to the Contractor without the proper receipt of forms of release. This resulted in "double payments" for the work.

The Lender failed to withhold retention from each monthly billing as is standard practice in the industry and the normal industry security protection for the Owner. This was below the standard of care for making progress payments.

The standard of care in the industry is that retention is withheld from each monthly billings until the very end of the project. The retention is withheld from each progress payment until the end of the project and the Final Releases are signed.

To not collect the retention until the end, as the Bank deponents suggest, compromises the Owner's and Bank's collateral in the project by awarding the project profit to the Contractor before it is completed. This process also would run afoul in normal industry monthly payment practices and releases. Subcontractors and vendors who provide materials and services at the end of the project must complete unpaid work until final completion.

of funds for work not performed. (See Analysis of Documents Binder, pages 16 - 21)

The Bank inappropriately released draws to the contractor without proper Owner authorization, without proper releases and without withholding proper retention. (See Analysis of Documents Binder, pages 5 - 15)

Deposition testimony of the deponents referenced herein indicates that the Bank personnel were not trained or monitored with regard to the standard of care for construction progress billings.

The Bank's invoices to the Owner for payment of interest due on the draw total did not contain sufficient information to reasonably alert an unsophisticated borrower of the contractor's wrongdoing.

The Bank made inappropriate payments below the standard of care in the amount of $407,783.01. (Tab 4)

These are my major opinions, sub opinions and the basis of my major opinions and sub-opinions are contained in the Analysis of Documents Binder, and other documents and sources referenced therein.

Wagner Kirkman Blaine Klomparens & Youmans LLP (David A. Scharlach, Esq.)
Keszler Residence

DELTA CPM, INC.  
August 31, 2009

MBB/dg  
WKI 1024

## SUMMARY OF INAPPROPRIATE PAYMENTS FROM BANK TO CONTRACTOR

| Item | Amount Bank Improperly Released to Contractor | Amount Borrower Paid to Contractor | Total Amount Received by Contractor | Amount Received by Subcontractor | Difference Received by Contractor from Bank |
|---|---|---|---|---|---|
| Engineering, Harrison Sloan | $8,500.00 | $2,800.00 | $11,300.00 | $8,500.00 | $2,800.00 |
| Cabinetry, Golden State Interiors | $32,500.00 | $18,500.00 | $51,000.00 | $41,750.00 | $9,250.00 |
| Doors, California Architectural Traditions | $20,300.00 | $16,344.58 | $36,644.58 | 20,000.00 | $16,644.58 |
| Countertops, Stoneco | $10,700.00 | $0.00 | $10,700.00 | $2,870.26 | $7,829.74 |
| Stone Flooring, Stoneco | $18,800.00 | $13,836.27 | $32,636.27 | $5,000.00 | $27,636.27 |
| Plumbing, Waterworks & Fergusons | $10,200.00 | $46,469.96 | $56,669.96 | $0.00 | $10,200.00 |
| Appliances, Fergusons | $0.00 | $11,387.30 | $11,387.30 | $0.00 | $0.00 |
| Radiant Heating, Radiant Technology | $0.00 | $16,774.68 | $16,774.68 | $10,892.00 | $0.00 |
| Drywall, B-12 Drywall | $32,000.00 | $2,400.00 | $34,400.00 | $0.00 | $32,000.00 |
| Voltage, Mountain Built-In Systems | $8,500.00 | $3,696.25 | $12,196.25 | $0.00 | $8,500.00 |
| Blombery Windows (Release of Mechanic's Lien by Keszler) | | $58,854.00 | | | $58,854.00 |
| Framer, Mike Avila Construction (decorative ceiling) | $15,000.00 | $11,934.92 | $26,934.92 | $0.00 | $15,000.00 |
| Retaining Walls | $4,200.00 | $0.00 | $4,200.00 | N/A | $4,200.00 |
| Architectural Precast/Concrete | $11,200.00 | $0.00 | $11,200.00 | N/A | $11,200.00 |
| Stucco | $34,100.00 | $0.00 | $34,100.00 | $7,336.00 | $26,764.00 |
| Roof Covering | $77,200.00 | $2,789.00 | $79,989.00 | $25,789.00 | $54,200.00 |
| Exterior Windows/Doors | $55,607.27 | $3,789.51 | $59,396.78 | $0.00 | $55,607.27 |
| Ornamental Iron | $7,300.00 | $0.00 | $7,300.00 | N/A | $7,300.00 |
| 5% Retention not Withheld @ 72.27% Complete | | | | | $59,797.15 |
| **Total Amount Improperly Released by Bank to Contractor** | | | | | **$407,783.01** |